941 A.2d 1107

Joseph Nathan BELLAMY

v.

STATE of Maryland.

No. 47, Sept. Term, 2007.

Court of Appeals of Maryland.

Feb. 14, 2008.

Brian L. Zavin, Assistant Public Defender, (Nancy S. Forster, Public Defender, Baltimore, MD), on brief, for Petitioner.

Diane E. Keller, Assistant Attorney General, (Douglas F. Gansler, Attorney General of Maryland, Baltimore, MD), on brief, for Respondent.

Argued Before BELL, C.J. and RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (Retired, specially assigned) DALE R. CATHELL, (Retired, specially assigned), JJ.

HARRELL, J.

This case springs from Joseph Nathan Bellamy's convictions in the Circuit Court for Montgomery County for first degree murder and use of a handgun in the commission of a crime of violence. On 25 July 2003, the body of Jermaine "Jay" Carter was found in a wooded area near Brown Station Elementary School in Gaithersburg, Maryland. It bore two gunshot wounds, one in the back of the head and one in the right shoulder. Although the murder weapon was never located, ballistics analysis indicated that the victim's wounds were caused by two .38 caliber bullets fired from the same gun. A medical examiner testified at Bellamy's trial that either shot would have been fatal. The crime scene yielded numerous beer cans, as well as a makeshift crack pipe and black head

wrap near Carter's body. The victim's pants pockets were turned inside-out.

Police investigators retrieved four full or partial shoe impressions from the victim's body. One particular impression, on the back of the victim's shirt, came from a "lug type tread." Two impressions on the front of his shirt, as well as another on his right cheek, were made by an athletic shoe. These impressions were "consistent" with the athletic shoes being worn by Bellamy at the time of his arrest.[1]

The State presented at Bellamy's trial the following timeline of events regarding the murder. Around 6:00 P.M. on 24 July 2003, the victim and his cousin, Jermaine Jackson, took a bus to visit the victim's ex-girlfriend, Aisha Deen. Deen was married to Bellamy, although they were not living together then. There was some evidence that Deen and Carter had resumed their relationship. While at Deen's house, the two men each consumed approximately twelve beers and smoked two marijuana joints. The two men took a bus to the Lakeforest shopping center, where they later called the victim's mother requesting that she pick them up and drive them home.

They arrived back at the victim's home between 11:30 P.M. on 24 July and 12:45 A.M. on 25 July. A group of people, playing loud music, were hanging out in the parking lot of Carter's apartment complex. One of the group members, Amber Walker, testified that Carter walked past Bellamy and said "hello." Bellamy ignored Carter, but later told Walker, "We're going to get him." After making that statement to Walker, Bellamy proceeded to the home of Calvin "Southside" Welch,[2] and told Welch that the victim was outside.

---

1. Pairs of similar shoes, it was concluded, had been sold to as many as 130,000 people.

2. This person is referred to in the record as both "Welch" and "Welsh." There is no ambiguity to whom witnesses are referring, merely ambiguity regarding the actual spelling of his name.

Shannon Contee, another reveler, testified that Andre Saunders, Welch, and Bellamy went into Welch's apartment at one point during the evening. The three men left the apartment, and according to Carter's mother, Bellamy came to Carter's home and asked for Carter. Carter left a few minutes later with Bellamy. Bellamy, Carter, Welch, Saunders, and Jerrell Jackson then went to the park behind the elementary school. A few minutes after the men entered the park, Jackson rejoined the group gathered in the parking lot. Five minutes later, Contee heard two gunshots. She testified that she then saw Bellamy, Welch, and Saunders running to Welch's apartment. Amber Walker and Shenise Johnson testified that they heard the gunshots as well and that the gunshots were about two to three seconds apart.

The evening after the murder, 25 July 2003, Detective James Drury and Detective Gary Turner went to Bellamy's apartment. No one answered the door. The detectives walked around the complex and eventually found Bellamy with Jerrell Jackson. Bellamy attempted to mislead the detectives as to his name, but eventually identified himself correctly.[3]

Later in the evening of 25 July, as the State's case-in-chief unfolded, Bellamy encountered Shenise Johnson and Shawquana Thompson in the parking lot of the apartment complex. The women were throwing water balloons as a prank. One of the balloons struck Bellamy, who claimed that his cell phone was broken as a result. Bellamy retaliated by throwing bleach on Thompson's jeans and shoes. Thompson responded by saying "I know what you did last night" or "I know you killed Jay." This apparently provoked Bellamy even more, so he threw bleach on Thompson's face, also striking with the chemical her nearby seven-month old daughter.

Around 12:30 A.M. on 26 July 2003, Bellamy arrived at the home of a girlfriend, Topeka Walker, in Gaithersburg. Bella-

---

**3.** Bellamy signed a statement indicating that he hung out with friends until 11:00 P.M. on 24 July, at which point he went home, ate, and went to bed on the night of the murder. The detectives also noted Bellamy's distinctive athletic sneakers.

my appeared upset. He spent the night at her home. Around 11:00 A.M., Bellamy received a phone call from Jerrell Jackson. While they were talking, a news report appeared on the television about a body being found behind Brown Station Elementary School. Bellamy told Jackson to come to Topeka Walker's house to bring him a "bag" and his "hammer."[4]

When Jackson arrived at Walker's home, he gave Bellamy a book bag. Bellamy gave Jackson some cocaine, with instructions to sell it to support Bellamy's sister and her child. Bellamy and Topeka Walker got a ride with Jackson[5] to the Rockville Metro station. They took a bus to Silver Spring, where, at Bellamy's request, Walker bought him a bus ticket to Rochester, New York.[6] On 30 July 2003, arrest warrants were issued in Maryland for Bellamy, Jackson, Saunders, and Welch. Bellamy was arrested in Rochester two weeks later at the home of his half-sister.

The State also presented the testimony of Daniel Rothwell, a jailhouse informant.[7] Based on an agreement with prosecutors, Rothwell agreed to testify at Bellamy's trial in exchange for the State placing various charges against him on the stet docket. Rothwell claimed that Bellamy told him, while they were cellmates, that: (1) Carter and the mother of Bellamy's children were involved in a sexual relationship; (2) Bellamy did not regret killing Carter; (3) Bellamy always carried a "hammer" or gun; and (4) witnesses and the prosecutor in Bellamy's case could get hurt or killed. Rothwell also claimed that, on behalf of Bellamy, he communicated threatening messages to Saunders while incarcerated, urging him not to cooperate with prosecutors regarding Carter's murder.

---

4. The State introduced evidence that Bellamy previously had used the term "hammer" to refer to a gun.

5. The vehicle was driven by Lonniece McIntyre.

6. According to Topeka Walker, she purchased the bus ticket so Bellamy could avoid being seen on surveillance cameras in the bus station.

7. Rothwell had an extensive criminal record, including convictions for burglary, theft, and conspiracy to commit theft.

The State contended that Bellamy was guilty of premeditated first degree murder. For example, in closing argument, the prosecutor argued that Bellamy was the shooter of both shots and was the person initially to pull out the gun, using the latter fact as evidence of premeditation.

[Bellamy has] pulled the gun out, he has pointed it, he's pointed it at the vital part of the body, and he made that final choice to pull the trigger, to kill, to murder, to execute.

... One second goes by two seconds go by, three seconds go by. [Bellamy's] still making choices.

.... And he pulls the trigger a second time. Willful, deliberate, premeditated? Absolutely.

Bellamy's defense argued at his trial that it was Welch, not Bellamy, who murdered Carter. Bellamy called Welch and Saunders as witnesses. Both Welch and Saunders invoked the Fifth Amendment privilege against self-incrimination. Because Saunders's testimony was therefore unavailable, Bellamy sought to have statements attributed to Saunders from Saunders's earlier guilty plea hearing admitted as evidence.

Prior to Bellamy's trial, the State reached a plea agreement with Saunders. The terms of the agreement were that Saunders would plead guilty to being an accessory after the fact to the murder. The plea was contingent on Saunders "testifying fully and truthfully," if required, at Bellamy's trial.[8] At Saunders's plea hearing on 28 May 2004 in the Circuit Court for Montgomery County, the court expressed some concern over the terms of the plea agreement requiring Saunders to "testify truthfully."

**Court:** All right. When you say testify truthfully, I assume you mean testify consistent with the statements he's previously made.

**State's Attorney # 1:** Well, our position is that if we determine at any time that he's not being truthful, the deal is off. And it is our belief, based on our investigation and review of everything, is that he's been truthful.

---

8. Saunders's sentencing was postponed until after Bellamy's trial.

**Court:** Okay. It's always just a little waffly, I mean, truthful, what does that mean?

**State's Attorney # 1:** No, it's no, we're not—

**Court:** As long as you all know what it means yourselves, that's fine.

**State's Attorney # 1:** In other words we don't want him to tell us, you know, something he thinks he wants us to hear. We want him to be truthful and we believe he has been.

**State's Attorney # 2:** He has been debriefed on—

**State's Attorney # 1:** Yes.

**State's Attorney # 2:** the ramifications. I wouldn't want it thought that this question of truth or non-truth is a decision unilaterally within the possession of the State's attorney. It says what it says, whether or not he testifies truthfully. Ultimately it may be a question for someone else.

**State's Attorney # 1:** But our understanding is the truth has been reduced to writing and the statement he provided to us.

**State's Attorney # 2:** That is correct.

**Court:** That's what I was trying to clarify. Do we have somewhere what we believe the truth to be, so we can decide if it's consistent or inconsistent?

**State's Attorney # 1:** Well, it's based on you know kind of looking at it in its entirety and we believe what he told us so—

**Court:** Okay. All right.

The plea hearing continued. The State proffered facts, based on Saunders's statements to authorities, which it contended would support a finding of his guilt, beyond a reasonable doubt, of accessory after the fact. The portions of that proffer that Bellamy sought to have admitted as evidence at his trial are reproduced below.

They started walking off toward the school. Joe [Bellamy] and Jermaine [Carter] were walking together, about ten feet ahead of Saunders and Welch. When they were near the bleachers by the baseball field, Welch told Saun-

ders in a low voice, "We're going to get him," and then he [motioned] with his head toward Jermaine. At first Saunders did not make much of the comment, but when they passed the playground where they usually get high, he started about it more. When they reached the woods, Joe yoked Jermaine from behind. In other words, he would've demonstrated that he grabbed in an arm lock from behind, his arm around his neck. Welch ran over to Joe and Jermaine and Welch began kicking Jermaine as Joe Bellamy held Jermaine. He then started kicking Jermaine and then Joe. When I say "he" Welch started kicking Jermaine and then Joe got Jermaine down onto the ground. Welch was cursing him and calling Jermaine a "bitch ass nigger," that's in quotes, and words like that.

Then Welch pulled a dark-colored revolver with brown grips from his right front pants pocket and pointed the gun at Jermaine's mid-section and fired. Saunders heard the gunshot and saw the muzzle flash. Saunders turned and ran toward the apartments at that time, back down the path where they had come. About seven seconds after that, Saunders heard a second gunshot and about 20 seconds after that, as he still ran. Welch had run up to his side, had caught up with him. They continued to run together and Saunders looked over and saw the gun's grip hanging out of Welch's pants pocket. Saunders and Welch ran back to Welch's apartment and went into his bedroom. Welch's wife, Kim, was in the bedroom, Jerel[9] was in the bedroom playing a video game.

The State's proffer was extracted almost verbatim from Saunders's statement given to police on 24 May 2004, after Saunders had agreed to accept the State's offer of a plea bargain.

The State concluded its factual proffer at Saunders's plea hearing with:

---

**9.** We are unable to be certain from the record whether the reference here to "Jerel" was Jerell Jackson or some other person.

I wanted to advise the Court further that there have been some developments recently regarding Mr. Bellamy's act at the scene. And that is that there is a witness from the jail [Rothwell] who Mr. Bellamy confided in. Mr. Bellamy indicated to him that Welch had or another individual—is how he described this person—had shot Jermaine Carter. But that he also shot Jermaine Carter. In other words, he'd indicated that he was the person responsible for shooting Jermaine Carter in the back of the head. Your Honor, that's the State's proffer.

The trial court accepted the proffer, finding a sufficient factual basis to accept the guilty plea. Saunders's sentencing, as noted earlier, was deferred until after Bellamy's trial.[10]

Because the State's proffer at Saunders's plea hearing identified Welch, not Bellamy, as the shooter, Bellamy called Welch and Saunders as defense witnesses in his trial. Both Welch and Saunders, as previously noted, because their sentencings were pending, invoked their Fifth Amendment privilege against self-incrimination. Thus, Bellamy sought to have the portions of the proffer at Saunders's plea hearing admitted as evidence.

The State objected that the statements were inadmissible hearsay. The trial judge agreed with the State.[11] Bellamy was convicted by the jury of first degree murder and use of a handgun in the commission of a crime of violence. The trial court sentenced Bellamy to life in prison.[12] The Court of Special Appeals affirmed the convictions in an unreported opinion. We granted Bellamy's Petition for Certiorari to consider whether the exclusion from evidence at his trial the

10. Saunders and Welch, after pleading guilty to being an accessory after the fact to murder, each received a sentence of 18 months in prison.

11. The trial judge who presided at Saunders's plea hearing and the State's Attorneys who participated there also presided and participated, respectively, at Bellamy's trial.

12. Bellamy was serving other terms of imprisonment at the time for other crimes.

part of the State's proffer from Saunders's plea hearing was reversible error. *Bellamy v. State*, 400 Md. 646, 929 A.2d 889 (2007).

Bellamy presents three arguments. First, he contends that the statement should have been admitted as an adoptive admission of a party opponent (the State) under Maryland Rule 5–803(a)(2). Second, Bellamy asserts that Saunders's statement constitutes a declaration against penal interest and, therefore, should have been admitted under Maryland Rule 5–804(b)(3). Finally, if his first two contentions gain no traction with us, Bellamy argues that the statement should have been admitted under the residual hearsay exception enumerated at Maryland Rule 5–803(b)(24).[13] Because we hold that it was error to exclude the statement as it qualified as an admission of a party opponent, we shall not address Bellamy's latter two contentions.

As law students learn early, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Maryland Rule 5–801(c). Subject to a variety of exceptions, generally "hearsay is not admissible." Maryland Rule 5–802. One of the most important exceptions is the "statement by a Party–Opponent." Maryland Rule 5–803 provides, in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (a) Statement by Party–Opponent. A statement that is offered against a party and is:
>
> > (1) The party's own statement, in either an individual or representative capacity;
>
> > (2) A statement of which the party has manifested an adoption or belief in its truth;

---

13. At the time of Bellamy's trial, the residual hearsay exception, with one difference irrelevant to the present case, was codified at Maryland Rule 5–804(b)(5).

(3) A statement by a person authorized by the party to make a statement concerning the subject;

(4) A statement by the party's agent or employee made during the agency or employment relationship concerning a matter within the scope of the agency or employment; or

(5) A statement by a coconspirator of the party during the course and in furtherance of the conspiracy.

Bellamy's theory is that the State manifested its "adoption or belief in . . . [the] truth" of Saunders's statement when the Assistant State's Attorney stated at the plea hearing, "And it is our belief, based on our investigation and review of everything, is that he's been truthful," "We want him to be truthful and we believe he has been," and, "But our understanding is the truth has been reduced to writing and the statement he provided to us." [14] Therefore, Bellamy argues, under Maryland Rule 8–503(a)(2), that part of the proffer of Saunders's statements should have been admitted. The State contends that it "should not be considered a 'party-opponent' in a criminal prosecution for evidentiary purposes."

Much of the law surrounding the applicability of the equivalent of this hearsay exception against the government developed as a result of a debate of sorts among the federal circuits.[15] At common law, "the inconsistent out-of-court

---

**14.** In this respect, Bellamy's argument actually combines two of the hearsay exceptions in Maryland Rule 5–803(a). Bellamy seeks to get the statement admitted under Maryland Rule 5–803(a)(2). In order for that argument to succeed, however, we must be convinced that the statements made by the State's Attorneys regarding the veracity of Saunders's statement were made as agents or employees of the State of Maryland and the statements were made within the scope of that agency relationship. In addition, we must find that the agents sufficiently manifested their intent to adopt the statement as true.

**15.** Much of the Maryland Rules of Evidence, including Maryland Rule 8–503, was derived from the Federal Rules of Evidence. Maryland Rule 5–803 derives from Federal Rule 801, which states in pertinent part:

The following definitions apply under this article:

. . . .

statements of a government agent made in the course of the exercise of his authority and within the scope of that authority ... are not ... admissible ... as evidence of [a] fact." *United States v. Yildiz*, 355 F.3d 80, 81 (2nd Cir.2004) (citing *United States v. Santos*, 372 F.2d 177, 180 (2nd Cir.1967)); *see also* Anne Bowen Poulin, *Party Admissions in Criminal Cases: Should the Government Have to Eat Its Words?*, 87 MINN. L.REV. 401, 412 (2002) (stating that, prior to the adoption of the Federal Rules of Evidence, "party admissions were almost never admitted against the government in criminal cases").

The subsequent adoption of the Federal Rules of Evidence (the Federal Rules), however, caused conflict in the federal courts regarding the continuing vitality of *Santos*. Although there was widespread agreement among the circuits about the common law rule prior to the adoption of the Federal Rules, they profoundly disagreed upon the exact effect on that rule of the Federal Rules. *Compare United States v. Kampiles*, 609 F.2d 1233, 1246 (7th Cir.1979) ("Nothing in the Federal Rules of Evidence suggests an intention to alter the traditional rule and defendant has cited no truly contrary case indicating such a trend.") *with United States v. Morgan*, 581 F.2d 933, 938, (D.C.Cir.1978) ("Moreover, there is nothing in the history of the Rules generally or in Rule 801(d)(2)(B) particularly to suggest that it does not apply to the prosecution in criminal

---

(d) Statements which are not hearsay. A statement is not hearsay if
...
(2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

cases."). Commentators also struggled with the effect of the Federal Rules. *See* Michael H. Graham, Handbook of Federal Evidence § 801:23 n. 11 (6th ed. 2006) ("However given the clear language of Rule 801(d)(2)(D), one could certainly question whether *[Santos* and its progeny] continue to be good law.").

Even the court which authored *Santos* since limited its application. The Second Circuit, in *United States v. Salerno,* adopted a three-part test [16] to be used to determine if prior opening statements by prosecutors were to be admissible against the government.

First, "the district court must be satisfied that the prior argument involves an assertion of fact [clearly] inconsistent with similar assertions in a subsequent trial." Second, the court must determine "that the statements of counsel were such as to be the equivalent of testimonial statements" made by [the party]. Last, the district court must determine by a preponderance of the evidence that the inference that the proponent of the statements wishes to draw "is a fair one and that an innocent explanation for the inconsistency does not exist."

*United States v. Salerno,* 937 F.2d 797, 811 (2nd Cir.1991), *rev'd on other grounds,* 505 U.S. 317, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992) (quoting *United States v. McKeon,* 738 F.2d 26, 33 (2d Cir.1984)).[17]

---

**16.** Demonstrating the difficult and fractured development of this area of law, the *McKeon* court also listed five policy considerations, in addition to the three-part test, to consider when evaluating prior statements for admissibility of admissions of a party opponent. They are: (1) the potential that use of attorney statements from prior proceedings will "consume substantial time to pursue marginal matters"; (2) the risk of unfair and improper inferences from inconsistent positions; (3) the potential deterrence of "vigorous and legitimate advocacy"; (4) the risk that a compelled explanation of the inconsistency may "expose work product, trial tactics, or legal theories" thus compromising the client's rights and (5) the risk that admission will require the withdrawal of the attorney who made the prior statements. *United States v. McKeon,* 738 F.2d 26, 32–33 (2d Cir.1984).

**17.** *Salerno* and *McKeon* both note that "[s]peculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses

Since the adoption of the Federal Rules, the federal circuits have drifted apart in their interpretation of Rule 801. On one side of the divide stands the Seventh Circuit as the leader, which has held that "in a criminal prosecution government employees are not considered servants of a party-opponent for the purposes of the admissions rule." *Kampiles,* 609 F.2d at 1246; *United States v. Powers,* 467 F.2d 1089, 1095 (7th Cir.1972); *United States v. Prevatte,* 16 F.3d 767, 779 n. 9 (7th Cir.1994); *United States v. Arroyo,* 406 F.3d 881, 888 (7th Cir.2005); *see also United States v. Zizzo,* 120 F.3d 1338, 1351 n. 4 (7th Cir.1997) ("Based on the common law principle that no individual should be able to bind the sovereign, we generally decline to apply Rule 801(d)(2) to statements made by government employees in criminal cases."). On the other side of this jurisprudential gully the flag-bearer is the Ninth Circuit, which permits admission of statements by government agents who are not involved with the litigation to be admitted in a criminal proceeding. *United States v. Van Griffin,* 874 F.2d 634, 638 (9th Cir.1989) (holding that a manual on field sobriety testing issued by the government should be admissible as an admission of a party opponent in a drunk driving case); *United States v. Bakshinian,* 65 F.Supp.2d 1104, 1110 (C.D.Cal.1999) (holding that "the statement of the government prosecutor falls within the party-opponent rule, the Court will not apply the *McKeon* requirements, and the admissibility of the statement at trial will be considered under typical Rule 402 and Rule 403 standards").

Most of the remaining federal circuits are distributed somewhere between those two poles. *See United States v. Branham,* 97 F.3d 835, 851 (6th Cir.1996) (noting that the "government concedes that Rule 801(d)(2)(D) contemplates that the federal government is a party-opponent of the defendant in a criminal case" and holding that the statements of a paid informant are admissible against the government); *United States v. Reed,* 167 F.3d 984, 989 (6th Cir.1999) (re-affirming

in the [opponent's] case or invitations to a jury to draw certain inferences should not be admitted." *McKeon,* 738 F.2d at 33.

*Branham* and noting that statements of a paid informant could be admissible against the government as an admission of a party opponent); *United States v. Kattar,* 840 F.2d 118, 130 (1st Cir.1988) (stating "[w]hether or not the entire federal government in all its capacities should be deemed a party-opponent in criminal cases, the Justice Department certainly should be considered such" and admitting as evidence statements argued in briefs in separate litigation because the Justice Department had manifested its adoption and belief in the truth of such statements); *United States v. Blood,* 806 F.2d 1218, 1221 (4th Cir.1986) (stating that a statement by a government attorney during voir dire would be binding against the government if it had constituted a "clear and unambiguous" admission); *United States v. Barile,* 286 F.3d 749, 758 (4th Cir.2002) (holding that in prosecution for making false statements to the FDA, the statements of an employee of the FDA could be admitted against the government if the proper foundation is laid); *United States v. Durrani,* 659 F.Supp. 1183, 1185 (D.Conn.1987), *aff'd,* 835 F.2d 410 (2d Cir.1987) (holding that government agent's out of court statements could not be admitted against the government); *United States v. GAF Corp.,* 928 F.2d 1253, 1262 (2nd Cir.1991) (holding that a bill of particulars filed by the government is admissible as an admission of a party opponent); *United States v. DeLoach,* 34 F.3d 1001, 1005 (11th Cir.1994) (adopting the test from *Salerno* discussed *supra); United States v. Warren,* 42 F.3d 647, 655 (D.C.Cir.1994) (holding that government had manifested its belief in sworn statements by a police officer contained in an affidavit, therefore the statements were admissible under Federal Rule 801(d)(2)(B)).

The States and the District of Columbia are split as well. *Harris v. U.S.,* 834 A.2d 106, 118 (D.C.2003) (agreeing with the "First Circuit, the D.C. Circuit, and then-Judge (now Justice) Stevens that the United States is 'bound by the position taken in a formal prosecution ... [and] cannot escape a view taken in a separate prosecution on the ground that one prosecution simply represents the views of its agents who participate'" (quoting *Freeland v. United States,* 631 A.2d

1186, 1192 (D.C.1993))); *State v. Worthen*, 765 P.2d 839, 847–48 (Utah 1988) (holding that a letter written by the prosecuting attorney to the trial judge was admissible as a party admission); *State v. Cardenas–Hernandez*, 219 Wis.2d 516, 579 N.W.2d 678, 686 (Wis.1998) (holding "that a court should not admit into evidence in a criminal proceeding a prior statement made by a prosecutor unless the court concludes that the three guidelines ... applied in *Salerno* ... are satisfied"); *State v. Pearce*, —— Idaho ——, —— P.3d ——, ——, n. 8, 2007 WL 1544152, 12 n. 8 (App.2007) (rejecting the permissive approach adopted by *Kattar* and *Bakshinian* and, instead, adopting the test in *Salerno); Garland v. State*, 834 So.2d 265, 267 (Fla.Dist.Ct.App.2002) (holding that a forensics report was admissible against the government as party admission); *Allen v. State*, 787 N.E.2d 473, 479 (Ind.Ct.App.2003) (holding that unsworn pre-arrest statement of a police officer was admissible against the government as a party admission); *State v. Brown*, 170 N.J. 138, 784 A.2d 1244, 1254 (2001) (holding that the government had not adopted the statements of an informant submitted in a sworn affidavit in support of a search warrant submitted before the defendant's indictment); *Hoover v. State*, 552 So.2d 834, 839–40 (Miss.1989) (adopting and applying the test in *Salerno* and *McKeon* to hold that the exclusion of the prosecutor's statements at a former trial was in error); *People v. McDaniel*, 164 Ill.2d 173, 207 Ill.Dec. 304, 647 N.E.2d 266, 272 (1995) (holding that out-of-court statements by a prosecutor are not admissible as an admission of a party opponent); *State v. Therriault*, 485 A.2d 986, 992 (Me. 1984) ("We find nothing in the Federal Rules of Evidence nor in Maine's adoption of M.R.Evid. 801(d)(2) suggesting an intent to alter the rule as explained in *Powers* and *Santos.");* *Rodela v. State*, 829 S.W.2d 845, 849 (Tex.App.1992) (holding that a statement by a police sergeant was admissible against the government as an admission by an agent of a party opponent); *State v. Villeda*, 165 N.C.App. 431, 599 S.E.2d 62, 66 (2004) (holding that a state trooper's out of court statements were admissible against the government as an admission by an agent of a party opponent); *State v. Asbridge*, 555

N.W.2d 571, 576 (N.D.1996) ("Although there appears to be some disagreement among the courts over the admissibility of statements by government attorneys after the initiation of proceedings, it appears fairly well-settled that statements by government agents at the investigative level are not admissible....").

In light of the facts of the present case, we find the rationale in the line of cases that treat statements of government attorneys as eligible admissions to be more persuasive than the rationale offered in *Santos* and *Kampiles*. Therefore, the exclusion of the desired part of Saunders's statement at Bellamy's trial was error. The court in *Kampiles* justified its decision on the basis that, because "the agents of the Government are supposedly disinterested in the outcome of a trial and are traditionally unable to bind the sovereign, their statements seem less the product of the adversary process and hence less appropriately described as admissions of a party." *Kampiles*, 609 F.2d at 1246 (citations omitted). That rationale is not persuasive for at least two reasons.

First, the Assistant State's Attorneys unequivocally manifested an adoption of or belief in Saunders's statement when they said, "And it is our belief, based on our investigation and review of everything, is that he's been truthful," "We want him to be truthful and we believe he has been," and, "But our understanding is the truth has been reduced to writing and the statement he provided to us." Without this express, in-court adoption of Saunders's statement, our view may have been different. Whether lesser actions by a prosecutor manifesting an adoption of a statement, such as merely submitting the statement in support of a court filing or acceptance of a plea, would render the statement admissible against the government in a subsequent proceeding remains to be seen.

Second, based on the facts of this case, we are able to conclude that the prosecutors acted as authorized agents of the State of Maryland at Saunders's plea hearing. It could not be otherwise. The judge presiding at Saunders's plea hearing accepted the representations made by the prosecutors

as a sufficient substantive basis for Saunders's plea. If the statements of the prosecutors were not, in fact, statements of authorized agents of the State of Maryland, Saunders's plea would be invalid.

■ More generally, the rationale in *Kampiles* that government agents are "traditionally unable to bind the sovereign" simply does not apply to prosecutors.[18] There are many opportunities for a prosecutor to bind the government in the course of a criminal trial.[19] *See Giglio v. United States*, 405

---

18. Louisell and Mueller offer a similar criticism.

 To the suggestion that government agents are "uninterested personally" in the outcome of government litigation, it may be replied that much the same may usually be said of agents employed by private entities. It may be true that to some extent the sheer size of the government and the protections accorded by the civil service system may combine to dissociate any one agent from success or failure in any one case, but there exist similar factors in private industry, which sometimes involves massive entities and restrictions in the form of federal and state regulations and clauses in union contracts which similarly dissociate any one employee from success or failure in a single case. To the suggestion that agents are "unable to bind the sovereign," it may be replied that this principle only restates (indeed, overstates) the question, which is whether an agent should be able not to "bind" but to make statements admissible against the sovereign.

 4 D. Louisell & C. Mueller, FEDERAL EVIDENCE § 426, at 328 (1980).

19. In reality, Bellamy does not seek to "bind" the prosecution to Saunders's statement as adopted at the plea hearing. There is an important distinction between "binding" a party to an admission and merely admitting the statement into evidence. A binding admission forecloses the need for any more inquiry into the issue. The issue is formally conceded. When a statement of a party opponent is admitted into evidence, the opponent remains free to argue a position contrary to that taken in the statement. The fact finder may consider, if it so chooses, to consider the party's previous statement in making its determination. *See* 2 Wharton's Criminal Evidence § 6:16 (15th ed.2001)

 (A distinction must be made between an attorney's judicial admission, which, like a stipulation, can bind a party, and an attorney's evidentiary admission which is admissible against the party but not necessarily binding. A judicial admission is an express waiver made in court or before trial by the party or his attorney conceding for the purposes of the trial the truth of some alleged fact. The party with the burden of proof is, therefore, relieved of that burden and the fact is deemed proved.)

U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) ("A promise made by one attorney must be attributed [for particular purposes and subjects] . . . to the Government"). All of the motions, filings, pleadings, and arguments (or lack thereof) made by a prosecutor in a criminal case may serve to bind the government to a course of action or outcome. *See* Irving Younger, *Sovereign Admissions: A Comment on United States v. Santos,* 43 N.Y.U.L. REV. 108, 109 (1968) ("In either criminal or civil cases, counsel for the government may make a concession or enter into a stipulation with respect to the facts."); Poulin, *supra,* at 431 ("Not only are prosecutors authorized to speak for the government in criminal cases, but they can also unquestionably bind the government on a range of legal matters through, for example, stipulations and plea agreements."). For example, relevant to the murder at the core of present case, prosecutors entered into plea agreements with Saunders and Welch. Such an agreement generally binds the State of Maryland to its terms. *Tweedy v. State,* 380 Md. 475, 488, 845 A.2d 1215, 1222 (2004).

Furthermore, we find it persuasive that the federal circuit most reluctant to admit evidence as an admission against the government, the Seventh Circuit, thus far has declined to extend its prohibition to government attorneys' statements made in a court proceeding and has acknowledged the vitality of contrary authority. *See Zizzo,* 120 F.3d at 1352 n. 4 ("We

---

It is this distinction that makes inapposite a comparison of the instant case to *Sifrit v. State,* 383 Md. 77, 857 A.2d 65 (2004). In *Sifrit,* the defendant challenged her conviction for murder on the grounds that the State violated her right to due process when it argued an inconsistent theory of the crime at the separate trial of her co-defendant husband. We held that due process is violated only where "the demonstrated inconsistency exists at the core of the State's case." *Sifrit,* 383 Md. at 106, 857 A.2d at 82. The State acknowledges that "Bellamy does not, and could not, contend that there has been a due process violation. . . ." Following *Sifrit,* a State's assertion of material fact in the trial of one criminal defendant could bind the State, thus prohibiting the State from arguing a "core inconsistency" of material fact at the trial of another criminal defendant accused of the same crime or related crimes. In the present case, however, no due process concerns are implicated, and the State remains free to argue any theory of the crime reasonably supported by the evidence.

note, however, that a number of courts have rejected that approach when dealing with statements made by government attorneys." (citing *Kattar* and *Morgan)*).

We also find persuasive, but need not adopt or select either at this time, the tests articulated by the Second Circuit and McCormick. McCormick's treatise recommends a balancing test.

> The cases ruling against admissibility involve statements by agents at the investigative level, with statements by government attorneys after the initiation of proceedings being held admissible. An admissibility dividing line based on the agent's position in the government may properly balance the conflicting interests involved. While Federal Rule 801(d)(2) does not specifically address the question, it is very hard to find any support in its language or structure for a blanket exclusion of statements by government agents. However, a balancing approach of the type suggested above appears consistent with its basic approach and the various policy concerns involved.

2 Kenneth S. Broun et al., McCORMICK ON EVIDENCE § 259 (6th ed.2006).

Under McCormick's test, the result in Bellamy's case is clear. A prosecutor made an unambiguous assertion that a particular statement was true at the penultimate proceeding in the case against Saunders. The statement was not made at an early, investigative stage of the case. It was not made by an investigative agent of the State who maintains a seemingly neutral and unadversarial posture during the trial process, such as an investigator or forensics expert. The adoption of Saunders's statements was made by the State's authorized advocate.

A similar result obtains by applying the test articulated by the Second Circuit in *Salerno* and *McKeon* regarding inconsistent statements. As noted above, the three-part test requires (1) an assertion of fact clearly inconsistent with a subsequent assertion at trial; (2) the assertions of fact were equivalent to

testimonial statements; [20] and (3) that inference that the party seeking to admit the evidence wants to have the fact finder draw is a fair inference, and there is not an innocent explanation for the inconsistency. The implicated elements of the test would be satisfied in the present case. The assertion that Welch shot Carter is clearly inconsistent with the State's later assertion that Bellamy shot Carter twice. Finally, the inference that Bellamy obviously desired the jury to draw, that the State at one point believed that Welch was the sole shooter, is a fair inference.[21]

Because we conclude that the part of Saunders's statements desired by Bellamy should have been admitted as an adoptive admission against the State, we must now determine if the error in excluding the statements was reversible error or harmless error. *Hutchins v. State,* 339 Md. 466, 475, 663 A.2d 1281, 1286 (1995). We conclude that the error in excluding the testimony was harmless, and thus, Bellamy's conviction must be affirmed.[22]

---

20. This element of the test has little application to the present case. This element is intended to limit introduction of a defendant's attorneys statements from a previous trial where the defendant was not involved in formulating such a statement. *See McKeon,* 738 F.2d at 33 ("Some participatory role of the client must be evident, either directly or inferentially as when the argument is a direct assertion of fact which in all probability had to have been confirmed by the defendant."). No such concerns exist regarding the relationship between the State's Attorneys and the government in the instant case.

21. The State contends that the relevant part of the proffer should not be admitted because Saunders's statement would "engender confusion, divert the jury's attention from the issues before it, and waste time." This argument is inapplicable, however, because admissions of a party opponent, like all evidentiary assertions, are restricted by other rules of evidence, including Maryland Rules 5–401 through 5–403. Specifically, Maryland Rule 5–403 permits trial judges to exclude evidence to prevent "confusion of the issues," "misleading the jury," or "waste of time."

22. In determining whether the exclusion of Saunders's statement was harmless, we assume in our analysis that the jury, if presented with the excluded statement, would have accepted the statement as true and given it great credibility and weight because Saunders's statement would have been the only one available from an eye witness. We ignore

factors that typically would weigh against the credibility of Saunders, including his consumption of alcohol, marijuana, and PCP on the day of the murder. We also ignore the fact that Saunders's statement that Welch shot Carter in the "mid-section" is inconsistent with the forensic evidence that Carter was shot in the right shoulder and the back of the head.

We also assume, *arguendo*, that only the portion of Saunders's statement described above would be admitted, although the State would likely be able to urge successfully the admission of the remainder of the proffer, which is damaging to Bellamy, under the doctrine of verbal completeness. *Conyers v. State*, 345 Md. 525, 541, 693 A.2d 781 (1997); Maryland Rule 5–106. For example, the State's balance of proffer, again taken almost verbatim from Saunders's statement, was:

> Saunders saw Jermaine Carter walking to his apartment. Joe Bellamy also saw Carter walking to his apartment, and motioned to him with his thumb, acknowledging him. In other words, it's sort of a thumbs up acknowledgment of seeing the other person, which he would have described at trial. About 15 to 20 minutes later, Bellamy walked over to Jermaine Carter's apartment. Saunders saw Joe Bellamy and Jermaine Carter talking in front of Carter's apartment building. And then he saw Welsh walk over to Joe and Jermaine. Saunders followed Welsh because he thought they were going to split away to smoke some more PCP away from everyone else. And he would have testified that he didn't want to be left out, he wanted to be included.

The proffer, following the part desired to be admitted by Bellamy, continued:

> The following evening, the police came to the [C]lusters [apartment complex] questioning people about the murder. After the police left, Joe Bellamy told Sanders [sic], "They don't have nothing on us, just chill out." Mr. Saunders also said in his statement last week— meaning around May 17th of this year, he was approached by another inmate at the jail whose nickname is Ghost. Ghost said he had a message from Joe Bellamy and Joe said, "If they want you to be that don't do that." And what he's referring to in the context of if the State wants you to do something, don't do it. Saunders took that as something to be concerned about and to mean not to testify as the State's witness.
>
> Also last week Saunders saw Joe Bellamy at the jail. Saunders was in his housing unit playing cards with someone when Joe passed by in the hallway. Joe motioned with his fingers to simulate talking. And then he motioned with his hand with a mean look on his face *meaning not to talk and he would demonstrate as I am doing now.* It was through a glass and then he gave a very hostile look toward Mr. Saunders.....
>
> All right. And, Your Honor, just as of the last, I'd say last 72 hours, there have been two additional threats. One at the jail in the visitor's room, where it so happened that Mr. Saunders and Mr. Bellamy received visitors and were sitting next to each other while receiving visitors. Mr. Bellamy essentially turned to Mr. Saunders and told him not to cooperate. Apparently overnight there was another threat from an inmate who indicated something to the effect to Saunders

■ In *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), we adopted the test for harmless error announced by the Supreme Court in *Chapman v. State,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). As adopted in *Dorsey,* the harmless error rule is:

> When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of-whether erroneously admitted or excluded-may have contributed to the rendition of the guilty verdict.

*Dorsey,* 276 Md. at 659, 350 A.2d at 678.

■ In performing a harmless error analysis, we are not to find facts or weigh evidence. Instead, "what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury ... to determine." *Dykes v. State,* 319 Md. 206, 224, 571 A.2d 1251, 1260–61 (1990). " 'Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility beyond a reasonable doubt.' " *Spain v. State,* 386 Md. 145, 175, 872 A.2d 25, 43 (2005) (Bell, C.J., dissenting) (quoting *Ware v. State,* 360 Md. 650, 716–17, 759 A.2d 764, 799 (2000)) (Bell, C.J., dissenting). " 'To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' " *United States v. O'Keefe,* 128 F.3d 885, 894 (5th Cir.1997) (quoting *Yates v.*

---

that we know what you're doing I[sic] was sort of left at that, but it was menacing.

If any reasonable interpretation or inferences from the unadmitted evidence offered by Bellamy could lead a reasonable jury to find Bellamy not guilty, we must reverse the conviction.

*Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)). The "harmless error rule ... has been and should be carefully circumscribed." *Younie v. State*, 272 Md. 233, 248, 322 A.2d 211, 219 (1974). Harmless error review is the standard of review most favorable to the defendant short of an automatic reversal. *See United States v. Gonzalez–Lopez*, 548 U.S. 140, 126 S.Ct. 2557, 2563, 165 L.Ed.2d 409 (2006) (comparing the errors subject to harmless error analysis with those subject to automatic reversal).

It is an unusual occasion where the erroneous exclusion of evidence contradicting material elements of the State's theory of the crime will be found to be harmless error. *See, e.g., United States v. Evans*, 438 F.2d 162, 173 (D.C.Cir.1971) (Bazelon, C.J.dissenting) ("[I]t will be exceedingly rare to find harmless error when that error concerns ... identification testimony ..."). This case presents such a rare circumstance because the excluded statement fragment actually introduces further evidence of Bellamy's guilt.

In his reply brief to this Court, Bellamy contends:

> While it is true that the statement taken alone does not establish Mr. Bellamy's innocence, its evidentiary value cannot be examined in a vacuum. What made Mr. Saunders' statement of such critical importance was that it contradicted the State's theory at trial that Mr. Bellamy, and not Calvin Welch, was the person who fired both shots at Mr. Carter. Had the jury been presented with this statement, it cannot be said beyond a reasonable doubt that it would have reached the same verdict that it did in the absence of the evidence.

Bellamy's argument simply ignores the law of aiding and abetting, which the jury, it appears, did not ignore. Bellamy's contention depends on his assertion that it is of "critical importance" that the State be required to prove, beyond a reasonable doubt, exactly who fired the fatal shots in order to convict Bellamy of first degree murder. That is not the case here.

 At trial, the jury was instructed by the court as follows:

> Now, as you have heard me say, the defendant is charged with the crime of murder. A person who aids and abets in the commission of a crime is as guilty as the actual perpetrator, even though he did not personally commit each of the acts that constitutes the crime. A person aids and abets the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed and seeking by some act to make the crime succeed. In order to prove that the defendant aided and abetted the commission of a crime, the State must prove that the defendant was present when the crime was committed and that the defendant willfully participated with the intent to make the crime succeed.

The instruction was not objected to at trial and is a correct statement of the law. *Evans v. State,* 382 Md. 248, 263 n. 11, 855 A.2d 291 n. 11 (2004); *Grandison v. State,* 305 Md. 685, 703, 506 A.2d 580 (1986). If the relevant portion of Saunders's statement were admitted and accepted by the jury as true, Bellamy would have accomplished the introduction of evidence of his own assistance in the commission of the murder.[23] Saunders's statement indicates that Bellamy initiated the physical attack on Carter, assaulted Carter, and then physically restrained Carter so that Welch also could attack. That evidence, on its own,[24] would be sufficient for a reasonable jury

---

23. The dissent correctly notes that the theory of aiding an abetting was not argued to the jury. The dissent, however, glosses over the fact that Saunders's statement, once boiled down to its crucial elements, indicates that "Bellamy did not shoot the victim; he merely helped the man who did." Any error in excluding an assertion to this effect from Bellamy's trial is harmless. Although the excluded evidence may raise a reasonable doubt concerning whether Bellamy pulled the trigger, it raises no doubt regarding the ultimate issue for the jury's determination—that Bellamy is guilty of murder in the first degree.

24. It is unnecessary to dwell here on the other evidence the State presented indicating that Bellamy lured Carter from his home, Bellamy informed Welch that Carter was outside, Bellamy and Welch changed

to convict Bellamy of aiding and abetting Carter's murder. We will find error harmless where the error resulted in the exclusion of *further* evidence of a defendant's guilt.[25]

Because we conclude that the erroneous exclusion of Saunders's statement was harmless, the convictions are affirmed.[26]

---

clothes just prior to the murder, Bellamy had a motive for the murder, and Bellamy deceived and fled from the police.

**25.** Although we do not look behind a jury's general verdict, we note that the jury may have revealed that it found Bellamy guilty based on aiding and abetting in Carter's murder. During its deliberations, the jury submitted a note to the judge asking for clarification of the instructions. The note asked, "Assuming we have found first degree murder ... do we have to find defendant Bellamy pulled the trigger or if he could have aided and abetted and be guilty of [use of a handgun in a crime of violence]?" Such a question would be unnecessary if they had found that Bellamy actually pulled the trigger.

At sentencing, Bellamy's counsel argued as much.

Somebody thought it was important enough to ask the Court for some guidance on whether or not we have to, as a jury, find defendant Bellamy pulled the trigger. So what I am suggesting is Judge, that the jury found Mr. Bellamy guilt as principle of the first degree murder on the aiding and abetting theory. And the inference through this question is, they come back and say, do we have to find he pulled the trigger to find him guilty of the use of the firearm. So, I believe that somebody on that jury had some doubt as to whether or not— now, ultimately they resolved it because they said, as an aider and abetter it doesn't matter if he was there. Someone pulled the trigger. But I think if you punish him in this case, as an aider and abetter, as opposed to the shooter, you're talking now about the other point I was making, disparaging sentences. Welch, Calvin Welch, he pled to an accessory after the fact in this case. He got 18 months in prison.

Bellamy's counsel argued that because he was found guilty of aiding and abetting Welch, he should receive a lenient sentence. In fact, Bellamy's counsel used Saunders's previously excluded statement as evidence that Bellamy aided and abetted Welch in the commission of the crime.

Our holding regarding harmless error in the present case would be the same if the jury had not sent the note to the judge. We cannot know exactly what the jury found. During the course of the deliberations after the jury submitted the note, it very well may have reversed its apparent position, finding that Bellamy pulled the trigger in the murder. We will not speculate as to what a jury found beyond the verdict of guilty. Nonetheless, the jury note shows that the jury was, at a minimum, aware of the law of aiding and abetting.

**26.** The same analysis and conclusion apply to the conviction for the use

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

BELL, C.J., and WILNER, J., Dissent.

WILNER, J., which BELL, C.J., joins.

The Court makes three important holdings in this case. I agree with two of them, but not the third.

Maryland Rule 5–803 contains a number of exceptions to the hearsay rule, one of which is what has generally been referred to as a party admission. In pertinent part, Rule 5–803(a) provides that a statement offered *against* a party, which is either the party's *own* statement, made in an individual or representative capacity, or a statement which the party has adopted or has manifested a belief in its truth, is not excluded by the hearsay rule. "Statement" is defined in Rule 5–801(a) as including "an oral or written assertion."

The Court today holds that Rule 5–803(a) may apply to statements made by prosecutors in a criminal case and to statements made by others, including a co-defendant, which a prosecutor has adopted or manifested a belief in its truth. Because, at least in some circumstances, a prosecutor may be regarded as an agent of the State authorized to make or adopt such statements in the course of his or her official duties, those kinds of statements, when made or adopted under those circumstances and offered by a defendant against the State, are not excluded by the hearsay rule. I agree with that holding.

---

of a handgun in a crime of violence. The fact that the excluded portion of Saunders's statement implies that Welch possessed the handgun throughout the crime is of no consequence. To be convicted of the use of a handgun in a crime of violence, Bellamy is not required to have actual personal possession of the weapon. Bellamy's actions as an aider and abettor are sufficient. *Broadway v. State*, 23 Md.App. 68, 78, 326 A.2d 212, 218 (1974); *Reed v. State*, 52 Md.App. 345, 355, 449 A.2d 448, 455 (1982); *White v. State*, 23 Md.App. 151, 165, 326 A.2d 219, 227 (1974).

The Court also holds that the clear, unambiguous assertions by a prosecutor in this case, made to a judge in support of a guilty plea entered by petitioner's co-defendant Andre Saunders, that Saunders was telling the truth when he stated, unequivocally, that Calvin Welch and not petitioner shot and killed the victim, Jermaine Carter, sufficed to constitute the adoption of Saunder's statement, and that the assertion was admissible against the State in petitioner's case. The Court thus holds that the trial court erred in excluding that evidence when offered by petitioner. I agree with that holding as well.

In order to sustain petitioner's conviction, however, the Court then holds that the error was harmless. It justifies that holding by noting that the jury *could* have, *may* have, convicted petitioner of the first degree murder of Carter as an aider and abetter of Welch, and that, had Saunders's statement that Welch was the shooter been admitted, as urged by petitioner, it would have supported that theory. I do not accept that holding, and, with respect, I therefore dissent.

The Court correctly states the test we have applied in determining whether an error committed in the course of a criminal proceeding may be regarded as harmless. It is a stringent test. As first stated in *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976), and repeated many times since:

> "[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, *beyond a reasonable doubt, that the error in no way influenced the verdict,* such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied *that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded— may have contributed to the rendition of the guilty verdict."*

(Emphasis added).

Obviously, an appellate court can declare whatever a majority of its judges desire, but a proper respect for the Rule of Law and necessarily implicit in the *Dorsey* test is that there must be a legitimate basis for the stated belief—that the

record must truly demonstrate, beyond a reasonable doubt, that the error "in no way influenced the verdict." That is simply not the case here.

In light of how this case was tried, the notion that the error was harmless because the jury may (or would if the proffered evidence had been admitted) have convicted petitioner as an aider and abetter, rather than as the actual executioner of Carter, is, at best, unpersuasive. *Neither side asserted that theory of liability,* and, despite the instructions on aiding and abetting and the jury note, there is no basis for inferring that the jury did find, or may or would have found, guilt on that basis.

Throughout the trial—from opening statement to closing argument—the State's unequivocal position was that petitioner, himself, shot and killed Carter, and it took every opportunity to dismiss the proposition that Welch was the shooter. It stressed the rage petitioner had because of Carter's romantic relationship with petitioner's wife, Aisha Deen: "Rage, rage. This man is enraged not just at the man he killed, he wants to kill the mother of his children." It stressed the fact that he alone had a motive to kill Carter: "Calvin Welch, any evidence he had a motive to commit an execution style murder? No. It points to Joe Bellamy, Joe Bellamy. Joe Bellamy is the one who has a deep and abiding hatred for Jermaine Carter." It stressed that petitioner carried a gun. It stressed that petitioner had admitted killing Carter to both Topeka Walker and Daniel Rothwell: "What else is the evidence in this case establishing? That he is a killer and not a mere witness. He admits it. He admits it. He admits it to two people." At the beginning of its closing argument, the State reminded the jury: "In opening statements, Mr. Hill [the co-prosecutor] told you the evidence would prove in this case that on July 25, 2003, Joseph Bellamy shot and killed Jermaine Carter. That was our promise."

Petitioner, on the other hand, throughout the trial, from opening statement to closing argument, consistently main-

tained that he was a mere witness and that Calvin Welch fired the two shots into Carter and killed him.

The Court finds weight in the instruction given on aiding and abetting and the note sent out by the jury. Some context is required. Petitioner was charged with first degree premeditated murder (Count 1) and use of a handgun in the commission of a felony or crime of violence (Count 2). Second degree murder was not specifically alleged, but because it is a lesser included offense subsumed in first degree murder, the jury was instructed on both degrees. The court told the jury not to consider the handgun charge until it reached a verdict on the murder charges and that, unless it found petitioner guilty of either first or second degree murder, it must find him not guilty of the handgun charge.

With respect to the murder charges, the court defined first degree murder as the intentional killing of another person with willfulness, deliberation, and premeditation and told the jury that, to convict petitioner of that offense, it must find that his conduct caused the death of Carter and that the killing was willful, deliberate, and premeditated. That was the State's theory of what occurred. To convict of second degree murder, the court said, the jury must find that petitioner's conduct caused Carter's death and that petitioner engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result.

The court then added that "[a] person who aids and abets in the commission of a crime is as guilty as the actual perpetrator, even though he did not personally commit each of the acts that constitutes the crime." To convict petitioner as an aider or abettor, the court said, the State had to prove that he "was present when the crime was committed and that the defendant willfully participated with the intent to make the crime succeed." There was no objection to that instruction because there was no basis for an objection. Notwithstanding that neither side had argued aider and abettor liability, the evidence could have supported such a theory of liability—peti-

tioner clearly was present when the crime was committed and there was evidence that he may have kicked or stomped on Carter and thus assisted in the murder—so an aiding and abetting instruction was appropriate.

Turning then to the handgun charge, the court told the jury that, to convict of that crime, "the State must prove that the defendant committed the felony or crime of violence of murder, and that he used a handgun in the commission of this felony or crime of violence."

During its deliberations, the jury sent the following note: "Assuming we found for first degree murder in count two, do we have to find defendant Bellamy pulled the trigger or if he could have aided and abetted and be guilty of Count 3?" [1] The court responded only that the aiding and abetting instruction applied to all three charges, and the jury ultimately returned a verdict of guilty as to first degree murder and use of a handgun.

It is simply not clear from this whether the jury found guilt based on petitioner's being the actual killer or being merely an aider and abetter. We don't know whether the note was prompted by one juror's momentary uncertainty or whether the entire jury had a fixed reasonable doubt as to whether petitioner was the shooter.

One thing is clear, however, at least to me. Given the way the case was tried, it is sheer speculation to dismiss the court's error as essentially irrelevant and therefore wholly inappropriate to declare, beyond a reasonable doubt, that keeping Saunders's statement from the jury "in no way influenced the verdict." Saunders was possibly an accomplice, but he was also a witness to the murder, and, theoretically, he had no better motive to accuse Welch than to accuse petitioner. The

---

1. The court believed that the jury had confused counts in the indictment with questions posed on a verdict sheet. First degree murder was count one, not count two. The verdict sheet showed second degree murder, which was not directly charged in the indictment, as the second question and the handgun charge, which was count two, as the third question.

critical point, entirely overlooked by the Court, is this. Had Saunders been willing to testify and had the court erroneously precluded him from doing so, there is no way that error could be regarded as harmless, because the Court could never legitimately conclude that his testimony, if believed, would not have influenced the verdict. This case militates even more strongly against harmless error, for, unlike the situation that would have been presented had Saunders testified directly, in which the jury could have made its own first-hand evaluation of his credibility, here the jury would have been presented with the fact that *the prosecutor* believed Saunders was telling the truth, *and had so informed the judge.* Here, the prosecutor *attested* to Saunders's credibility. If it would have been reversible error to preclude Saunders from testifying because the jury could have believed him, it surely must be reversible error to preclude the jury from knowing that the prosecutor also believed him and that the judge had acted on that belief in accepting a guilty plea.

The import of the prosecutor's vouching for Saunders's credibility is heightened by the fact that it was calculated and deliberate. It was wholly unnecessary for the prosecutor to have attested to Saunders's credibility at the guilty plea hearing. Saunders was admitting guilt to being an accessory after the fact. The State acknowledges that the basis of that charge was "that Saunders lied to police about the murder, 'divert[ing] attention from Joe Bellamy and Calvin Welch as to their involvement in what occurred.'" It was of no consequence to that admission—or to the validity of the guilty plea—whether Welch or Bellamy was the shooter. All that the prosecutor need have done to support the guilty plea was to urge that, whoever the shooter was, Saunders's statement and the additional proffer regarding his subsequent activity sufficed to show that he was an accessory after the fact. It was not necessary for the prosecutor to manifest a belief in the truth of Saunders's statement that petitioner was the shooter. Yet that is what he did.

The prosecutor's gratuitous adoption of Saunders's statement was significant for another reason. Part of the plea

bargain with Saunders was that he would "cooperate with the State in the trial of the other co-defendants in Jermaine Carter's murder," which, at the time, included both Welch and Bellamy, and that he would "testify truthfully." The prosecutor thus anticipated that Saunders would likely be called as a State's witness at petitioner's trial and that, if he testified in accordance with his statement, he would say that Welch was the shooter. Especially in light of the fact that the prosecutor then had some information indicating that petitioner may have been the shooter, if he had any doubt about the veracity of Saunders's assertion that Welch was the shooter, he would presumably not have adopted that assertion as the truth. He did adopt it. On behalf of the State's Attorney's Office, and therefore the State, he chose to believe and adopt Saunders's version of what occurred, and, in so doing, admitted that Welch and not petitioner was the shooter.

There is no question in my mind that the evidence was legally sufficient to convict petitioner of being either the executioner or an aider and abetter, but that is not the relevant point. The trial court excluded evidence from an eye witness that directly contradicted the State's singular theory that petitioner was the one who shot and killed Carter, and I think it impossible to conclude, beyond a reasonable doubt, that the exclusion of that evidence "in no way influenced the verdict." I would therefore reverse the judgment.

I am authorized to state that Chief Judge BELL joins this dissent.