963 A.2d 197

**Todd Tyrone TAYLOR**

v.

**STATE of Maryland.**

**No. 6 Sept.Term, 2008.**

Court of Appeals of Maryland.

Jan. 5, 2009.

138

Michael R. Braudes, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore, MD), on brief, for Petitioner.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, MURPHY, ADKINS, BARBERA and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

BATTAGLIA, Judge.

We are called upon to address the confluence of Maryland Rule 5–608(b),[1] which allows impeachment by examination regarding the witness's prior conduct but does not allow proof of the prior conduct by extrinsic evidence, and Maryland Rule 5–806,[2] which allows the impeachment of a hearsay declarant

---

1. Maryland Rule 5–608(b) states:
   **(b) Impeachment by Examination Regarding Witness's Own Prior Conduct Not Resulting in Convictions.** The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.
   References to the "Rules" throughout are to the Maryland Rules, unless otherwise noted.

2. Maryland Rule 5–806 states:
   **Rule 5–806. Attacking and Supporting Credibility of Declarant.**
   **(a) In General.** When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness.

"by any evidence which would be admissible ... if the declarant had testified as a witness."

Specifically, Todd Tyrone Taylor, Petitioner, was convicted of third degree sexual assault for engaging in anal intercourse with B.D., a 15 year-old boy, who did not testify at trial. B.D.'s version of events was presented through the testimony of the boy's father and a detective; others testified, although their testimony is not relevant here.[3]  During cross-examination of the father and Detective Deana Mackie, Taylor's counsel sought to impeach B.D.'s version of events, by eliciting from the father and detective that the story B.D. told about his encounter with Taylor was inconsistent, as well as that B.D. had lied about his prior sexual experience.  The trial judge sustained the State's objections, determining that Rule 5–608(b) would be violated because of the rule's prohibition of extrinsic evidence.

The Court of Special Appeals affirmed the conviction in an unreported opinion, holding that the trial court did not err in curtailing B.D.'s impeachment, and, nevertheless, that if error had occurred, it was harmless.  The court also declined to address a contention by Taylor that his probation order included an inappropriate condition, because the issue was not preserved for appeal.  We granted certiorari, *Taylor v. State*, 404 Md. 152, 945 A.2d 1270 (2008), to consider two questions:

1.   Did the trial court's restriction upon the impeachment of the credibility of a hearsay declarant whose extrajudicial statements were central to the State's case contravene

Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.  If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

**(b) Exception.** This Rule does not apply to statements by party-opponents under Rule 5–803(a)(1) and (a)(2).

**3.**   B.D.'s mother, another police officer and a DNA analyst also testified.

Petitioner's rights under the Confrontation Clause and Maryland evidentiary law?

2. Did the trial court impose an overbroad condition of probation ordering Petitioner "to have no contact with any minors?" [4]

We shall hold the trial judge improperly applied the extrinsic evidence limitation in Rule 5–608(b), in violation of the defendant's right to cross-examine the father and detective, when he prevented Taylor from impeaching the veracity of the hearsay declarant and his version of events regarding the sexual encounter in issue. We shall affirm the conviction, however, because the error was harmless.

## I. Introduction

This case arises out of a sexual encounter between Taylor and B.D., a 15 year-old boy. On September 22, 2004, B.D.'s father, who was estranged from B.D.'s mother, arrived at the family home to take his son to a back-to-school event at the

---

**4.** The Court of Special Appeals held that the probation condition was not preserved for review because Taylor had made no motion with respect to the sentence, but rather presented his contentions about the probation conditions for the first time on appeal. We granted certiorari, even though the State countered in its Answer to the Petition for Certiorari that the probation question was not only moot, but also not appropriately challenged by Taylor in his Petition. We need not address either of the State's contentions, because it is clear that Taylor's assertions about his probation conditions, were they to be construed as a motion to correct an illegal sentence, which under Rule 4–345(a) can be raised at any time, do not constitute an illegal sentence. Historically, to challenge an illegal sentence under Maryland Rule 4–345, a criminal defendant files a motion to correct an illegal sentence, and that motion "was entertained only where the alleged illegality was in the sentence itself or the sentence never should have been imposed." *Baker v. State,* 389 Md. 127, 133, 883 A.2d 916, 919 (2005). *See also Montgomery v. State,* 405 Md. 67, 81, 950 A.2d 77, 86 (2008) (holding that a sentence was illegal after defendant filed a motion to correct an illegal sentence). Thus, where the sentence or sanction was itself lawful, a Rule 4–345(a) motion is not an appropriate vehicle to challenge the legality of a sentence. *Baker,* 389 Md. at 134, 883 A.2d at 920; *Evans v. State,* 382 Md. 248, 279, 855 A.2d 291, 309 (2004). Taylor does not allege that the condition of probation was illegal, and in *State v. Griswold,* 374 Md. 184, 821 A.2d 430 (2003), we upheld probation conditions similar to that in issue here.

high school. Shortly after the father and son left the house, B.D.'s mother received a phone call from an individual who said that B.D.'s school planner had been found at the Silver Spring Metro Station, where B.D. did not frequent. After the mother and father questioned B.D. about why he was at the Metro Station and B.D. initially obfuscated, B.D. then admitted to a sexual encounter with a man, later identified as Todd Tyrone Taylor, in Taylor's apartment in Silver Spring that day, after B.D. had contact with Taylor on a chat line. After interviewing with Detective Mackie at the police station, B.D. was then referred to a hospital for a sexual assault examination, where he told a forensic nurse, Heidi Bresee, that he had had anal intercourse, and that he had engaged in fellatio; although there had not been any force, threats or weapons. Upon examination, Nurse Bresee observed an acute half-inch, exterior anal tear that she testified was consistent with anal intercourse. A DNA sample, taken by oral and anal swabbing and analyzed by a forensic scientist, matched that of Taylor.

Taylor was indicted by a grand jury on two counts of sexual offense in the third degree for engaging in anal penetration and fellatio,[5] and one count of sexual offense in the fourth

---

5. Former Section 3–307 of the Criminal Law Article, Maryland Code (2002), which was reenacted without change by Chapter 317, Acts of 2006, defined sexual offense in the third degree as:

(a) *Prohibited.*—A person may not:

(1) (i) engage in sexual contact with another without the consent of the other; and

(ii) 1. employ or display a dangerous weapon, or a physical object that the victim reasonably believes is a dangerous weapon;

2. suffocate, strangle, disfigure, or inflict serious physical injury on the victim or another in the course of committing the crime;

3. threaten, or place the victim in fear, that the victim, or an individual known to the victim, imminently will be subject to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping; or

4. commit the crime while aided and abetted by another;

(2) engage in sexual contact with another if the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual, and the person performing the act knows or reasonably should know the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual;

degree, which was nolle prossed.[6]   At trial, the State did not

(3) engage in sexual contact with another if the victim is under the age of 14 years, and the person performing the sexual contact is at least 4 years older than the victim;

(4) engage in a sexual act with another if the victim is 14 or 15 years old, and the person performing the sexual act is at least 21 years old; or

(5) engage in vaginal intercourse with another if the victim is 14 or 15 years old, and the person performing the act is at least 21 years old.

(b) *Penalty.*—A person who violates this section is guilty of the felony of sexual offense in the third degree and on conviction is subject to imprisonment not exceeding 10 years.

6.  Former Section 3–308 of the Criminal Law Article, Maryland Code (2002), in effect at the time of the encounter, defined sexual offense in the fourth degree as follows:

(a) *Prohibited.*—A person may not engage in:

(1) sexual contact with another without the consent of the other;

(2) except as provided in § 3–307(a)(4) of this subtitle, a sexual act with another if the victim is 14 or 15 years old, and the person performing the sexual act is at least 4 years older than the victim;  or

(3) except as provided in § 3–307(a)(5) of this subtitle, vaginal intercourse with another if the victim is 14 or 15 years old, and the person performing the act is at least 4 years older than the victim.

(b) *Penalty.*—A person who violates this section is guilty of the misdemeanor of sexual offense in the fourth degree and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both.

The Statute was amended by Chapter 217, Acts of 2004, effective October 1, 2004, adding Section (b)(2) and the words "Except as provided in paragraph (2) of this subsection" at the beginning of (b)(1). The Statute was amended again by Chapter 317, Acts of 2006, effective October 1, 2006, inserting present (a) and (c); and redesignating former (a) and (b) as present (b) and (d).   The current statute is as follows:

(a) *Person in a position of authority defined.*—In this section, "person in a position of authority":

(1) means a person who:

(i) is at least 21 years old;

(ii) is employed as a full-time permanent employee by a public or private preschool, elementary school, or secondary school;  and

(iii) because of the person's position or occupation, exercises supervision over a minor who attends the school;  and

(2) includes a principal, vice principal, teacher, or school counselor at a public or private preschool, elementary school, or secondary school.

(b) *Prohibited.*—A person may not engage in:

(1) sexual contact with another without the consent of the other;

call B.D. to testify, instead relying on the testimony from the boy's father and that of Detective Mackie to present B.D.'s version of events.

B.D.'s father testified that B.D. related to him that he had met Taylor over the Internet in a chat room on the day in question, that B.D. had traveled to Silver Spring where he had gone to Taylor's apartment, and that once there, B.D. and Taylor had engaged in anal intercourse. The father also testified that when he had heard this, he had become enraged, grabbed B.D. by the throat and demanded that B.D. take him to Taylor's apartment, where he attempted to enter, but was deterred by a security guard and later by a police officer, who instructed him to go to the police station and meet with a

---

(2) except as provided in § 3–307(a)(4) of this subtitle, a sexual act with another if the victim is 14 or 15 years old, and the person performing the sexual act is at least 4 years older than the victim; or (3) except as provided in § 3–307(a)(5) of this subtitle, vaginal intercourse with another if the victim is 14 or 15 years old, and the person performing the act is at least 4 years older than the victim.
(c) *Sexual abuse of a minor student by a person in a position of authority.*—(1) Except as provided in § 3–307(a)(4) of this subtitle or subsection (b)(2) of this section, a person in a position of authority may not engage in a sexual act or sexual contact with a minor who, at the time of the sexual act or sexual contact, is a student enrolled at a school where the person in a position of authority is employed. (2) Except as provided in § 3–307(a)(5) of this subtitle or subsection (b)(3) of this section, a person in a position of authority may not engage in vaginal intercourse with a minor who, at the time of the vaginal intercourse, is a student enrolled at a school where the person in a position of authority is employed.
(d) *Penalty.*—(1) Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty of the misdemeanor of sexual offense in the fourth degree and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both.
(2)(i) On conviction of a violation of this section, a person who has been convicted on a prior occasion not arising from the same incident of a violation of §§ 3–303 through 3–312 or § 3–315 of this subtitle or § 3–602 of this title is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.
(ii) If the State intends to proceed against a person under subparagraph (i) of this paragraph, it shall comply with the procedures set forth in the Maryland Rules for the indictment and trial of a subsequent offender.
Md.Code (2002, 2008 Supp.), § 3–308 of the Criminal Law Article.

detective there. The father then testified that he had taken B.D. to the police station where both he and B.D. were interviewed by Detective Mackie, followed by a forensic examination of B.D. by Nurse Bresee at Shady Grove Hospital. The father also testified that B.D. was crying and visibly shaken.

During cross-examination of the father, Taylor attempted to impeach B.D.'s version of events, on the basis of B.D.'s alleged fear of physical harm at the father's hand, and because B.D. allegedly had lied to his father about B.D.'s previous sexual experience. After eliciting that B.D. lied to the father about why his planner was in the Silver Spring Metro Station, the State objected to Taylor's questions eliciting whether B.D. had been forthcoming with his father about his prior sexual experience; the trial judge sustained these objections:

> [DEFENSE COUNSEL]: Well, what did he tell you when he started to tell the truth?
>
> [FATHER]: He told us exactly where he had been, how he got there and what had happened.
>
> * * *
>
> [DEFENSE COUNSEL]: So when he told you that, did you believe him?
>
> [PROSECUTOR]: Objection.
>
> THE COURT: Overruled.
>
> [PROSECUTOR]: Objection, Your Honor. May we approach?
>
> THE COURT: Very well.
>
> (Bench conference follows:)
>
> [PROSECUTOR]: (unintelligible) can't give an opinion as to whether or not he believed (unintelligible).
>
> [DEFENSE COUNSEL]: I'm asking him about his experience as a father. He knows his son better than anyone else here and if his son has a history of lying, and he's able to say that, I think that's probative to the jury to consider.
>
> [PROSECUTOR]: (unintelligible) and I think this witness can't give an open opinion as to (unintelligible).

THE COURT: (unintelligible) and you are objecting to that?

[PROSECUTOR]: (unintelligible) I just don't know the rules on that. (unintelligible)

THE COURT: Objection overruled.

\* \* \*

[DEFENSE COUNSEL]: Do you feel like you know your son very well?

[PROSECUTOR]: Objection.

THE COURT: Overruled.

[FATHER]: I feel I know him to a point.

[DEFENSE COUNSEL]: Okay. To a certain point, you don't know him?

[FATHER]: Well, you know, just like any other child, you know, I can't stand here and say that I know what my child is doing at all the time. But I know there are some things that, you know, he will do and he won't do.

Taylor also sought to elicit additional testimony about whether B.D. previously had been candid with his father about his sex life:

[DEFENSE COUNSEL]: Okay. So, tell me this. [D]o you think your son would be completely honest with you in discussion [sic] his sex life?

[FATHER]: Since this incident, yes. He has been.

[DEFENSE COUNSEL]: Okay. So since this incident, you believe he's been completely honest?

[FATHER]: Yes. I have.

[DEFENSE COUNSEL]: But before this incident, you believe he hadn't?

[FATHER]: I think he was very vague about it.

[DEFENSE COUNSEL]: So, did you ever discuss his sex life with him?

[FATHER]: Yes. We did.

[DEFENSE COUNSEL]: And what did he say (unintelligible)?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Well, tell me this. Why do you think that he's telling you the truth since this incident?

[DEFENSE COUNSEL]: Because we've had very serious conversations and I've explained to him, you know, the downfalls and the pits of lying to your parents.

[DEFENSE COUNSEL]: Okay. And you think that from that conversation that now persuades him to be completely honest with you?

[FATHER]: Well, not just the conversation but the fact that what all he's going through.

Cross-examination continued:

[DEFENSE COUNSEL]: Do you know if [B.D.] has a history of lying about his sexual past?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Your Honor, may we approach?

THE COURT: No.

* * *

[DEFENSE COUNSEL]: Other than this incident, have you ever known [B.D.] to lie?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

After the completion of the father's testimony, there was a discussion at the bench concerning whether Taylor's counsel would be permitted to question Detective Mackie about B.D.'s general tendency to lie about his prior sexual activity and about specific statements that tended to show that B.D. had not been truthful with Mackie about his encounter with Taylor:

[DEFENSE COUNSEL]: Your Honor, I wanted to revisit this matter regarding the testimony that I'm trying to elicit regarding his previous sexual experience. It is our intent to show that [B.D.], when asked about his sexual activities, that he will lie about that. And that's one of the things that

he lies about. He lies about his age. He lies about what he has done. And I believe that's probative for the jury to know about someone who's claiming, I mean the second charge is based solely on what he's claiming. And if we cannot show that when it comes to sexual matters, that this witness will lie, that I think the jury won't have the full picture.

THE COURT: What's your proffer?

[DEFENSE COUNSEL]: I want to ask him about—

THE COURT: Who? Ask who?

[DEFENSE COUNSEL]: Well, Detective Mackie. I wanted to ask the father about it but he's gone. I guess I could call him back in during our case now.

THE COURT: What do you want to ask him?

[DEFENSE COUNSEL]: I want to ask, did [B.D.] ever lie about his previous sexual activity? Did he lie about what he did? Did he lie to that person? To show that this person when it comes to his sexual history, his sexual activity, he will lie about that.

THE COURT: [Prosecutor?]

[PROSECUTOR]: Your Honor, I think that's specifically under the rape shield law were designed to protect. There's no allegations in this case that anyone else other than defendant was the source of semen, was the source of injury. There's an allegation that this child had a similar sexual encounter with someone that he met over this chat line during the month of July and he went to that individual's home in Prince George's County and identified that person by name. There's no specifics that he lied about it.

And Detective Mackie's questioning of the defendant where we have this tape. We've had a transcript made of it, it appears that he gets confused when he's asked about it. Have you ever done this before? No. Then he comes back and says, yes I did. I meet [sic] this guy Tony, but we didn't engage in sex. And he knew how to get there, there was some discussion about it, but he tells Detective Mackie

exactly what happened. But it's specifically what the rape shield laws (unintelligible).

\* \* \*

THE COURT: We'll cross that bridge when we get to it. We haven't gotten to it and if he's, his credibility is at issue based upon the prior consistent statements, then he'd be cross-examined on them. But we're not just going to have open-ended ["]have [sic] he ever lied in the past["] kinds of questions asked. This is not going to happen.

[DEFENSE COUNSEL]: I understand that. Also, Your Honor, (unintelligible) understand I asked him if [B.D.] ever told him that he used a condom (unintelligible) I believe, well according to the prior statement, he said he had. However, later on he told the police that a condom was not used. I wanted to elicit that. I was overruled by Your Honor when the objection was made by the State. But I need to show this jury that when it comes to sexual matters, that this complaining witness lies. And—

THE COURT: There's got to be evidence to support that as opposed to a theory.

[DEFENSE COUNSEL]: Well, exactly. And I was trying to get that evidence by saying that he told, that [B.D.] told his father one thing, he told the police something else. Evidence of lying about sexual activity.

[PROSECUTOR]: And, Your Honor, [B.D.] can be questioned about that and the father can be brought back in, if we get to it. It's [going] to have to be on a witness by witness basis. Not, the dad can't be questioned about what [B.D.] told him and then for it later to be found out to be a lie.

The State called Detective Mackie to the stand, who testified that she interviewed B.D. and his father after they arrived at the police station, that she investigated telephone records and checked license plate numbers to identify Taylor as the suspect, and that she had accompanied the boy and the father to Shady Grove for the forensic examination. Specifically, with respect to what B.D. had told her about the encounter,

Detective Mackie relayed to the jury that B.D. said that Taylor was the assailant, that the encounter took place in Taylor's apartment, and that it occurred on September 22, 2004.

During cross-examination, Taylor tried to show that B.D. had told inconsistent stories to Detective Mackie about his encounter with Taylor and that B.D. had a history of lying about prior sexual activity:

[DEFENSE COUNSEL]: Okay. Now, did you, when you were interviewing [B.D.] and his father, did you, you assumed that what they told you about the incident with Mr. Taylor was the truth, correct?

[DETECTIVE MACKIE]: Well, I had no reason to doubt that until we do an investigation.

\* \* \*

[DEFENSE COUNSEL]: Okay. All right. So when [B.D.] told you about the incident that night, you didn't have an reason to question whether that really happened did you?

[DETECTIVE MACKIE]: No.

\* \* \*

[DEFENSE COUNSEL]: Did he tell you the truth throughout the whole interview that you had with him?

[DETECTIVE MACKIE]: I believe he told me the truth.

[DEFENSE COUNSEL]: Did you catch him in any lies?

\* \* \*

[DETECTIVE MACKIE]: I don't recall catching him in any lies. It doesn't stand out to me that he lied to me in any manner.

[DEFENSE COUNSEL]: All right.

[DEFENSE COUNSEL]: May we approach, Your Honor?

THE COURT: Very well.

(Bench conference follows:)

[DEFENSE COUNSEL]: Your Honor, I have on the tape when she interviewed him that she asked him why do you feel bad about this. She said do you feel bad about this incident. He said yes. He said because this is my first

time. Now she said, anal sex then? He said yes. [L]ater on in that interview he admits that he had anal sex with someone else previously to this. It shows that he lied about this incident, about his sexual activity.

THE COURT: That's all (unintelligible).

[DEFENSE COUNSEL]: Yes.

[PROSECUTOR]: (unintelligible) [B.D.] takes the stand and denies having made the statement. That's not proper impeachment to—

THE COURT: (unintelligible)

[PROSECUTOR]: (unintelligible)

(Bench conference concluded)

[DEFENSE COUNSEL]: (unintelligible) Detective Mackie, that you don't know exactly what went on between Mr. Taylor and [B.D.] in Mr. Taylor's apartment, do you?

[DETECTIVE MACKIE]: Just what I was told. I wasn't there.

[DEFENSE COUNSEL]: Right. So you just believed what [B.D.] told you, correct?

[DETECTIVE MACKIE]:Yes. I suppose, yes.

[DEFENSE COUNSEL]: Okay. And you couldn't testify today whether that was the truth or a lie, could you?

\* \* \*

[DETECTIVE MACKIE]: Well, no. Because I wasn't the one gathering evidence and I wasn't there.

[DEFENSE COUNSEL]: You weren't there?

[DETECTIVE MACKIE]: Correct?

After Detective Mackie testified, the State called Nurse Bresee, a pediatric nurse and forensic specialist, to testify about B.D.'s physical injuries and her professional opinion based on her observations. She testified that she observed B.D.'s injuries within 10 hours of the incident; that B.D. had an acute half-inch tear in the external surface of his anus consistent with penile but not necessarily digital penetration; and that she used a physical evidence recovery kit to take DNA samples. On cross-examination, Taylor elicited from

Nurse Bresee, without objection from the State, that, when she was filling out an earlier part of the intake form, B.D. informed her that Taylor had ejaculated in his mouth, and that he had been uncertain whether Taylor had ejaculated into his anus, but that B.D. had reversed the areas when he was questioned further.

The State called several other witnesses, including a DNA expert who testified that the DNA recovered from the anal swabs matched that of Taylor's. The State rested, and Taylor took the stand, denying that he engaged in anal penetration or fellatio, but admitting to having left a message on an adult gay hotline. According to Taylor, B.D. had misrepresented himself as a 21 year-old college student during their telephone conversation. Taylor also asserted that after arranging to meet, he realized that B.D. had lied about his description; Taylor also testified that he had told B.D. to leave, but B.D. had refused, insisting on a sexual encounter. Based on B.D.'s persistence, Taylor explained that he had succumbed to B.D. and had agreed to watch pornography and to masturbate with him. Taylor also explained that B.D. had taken semen from Taylor's body and put it into his own buttocks.

The jury convicted Taylor of one count of sexual offense in the third degree for engaging in anal intercourse, but acquitted him of the count involving fellatio. The trial judge then sentenced Taylor to five years in prison, suspending all but 10 days, and to 18 months of probation, during which Taylor was required to register on the sex offender list and to submit to mandatory blood testing, and was prohibited from contacting any minors, B.D. or his family. Taylor did not file a motion to alter or amend his sentence or to challenge the sentence as illegal under Maryland Rule 4–345(a),[7] and noted his appeal to the Court of Special Appeals.

In the Court of Special Appeals, Taylor argued that the trial judge erred when he curtailed the cross-examination of B.D.'s

---

7. Maryland Rule 4–345 is entitled "Sentencing—Revisory Power of Court"; subsection (a) addresses illegal sentences and states that "[t]he court may correct an illegal sentence at any time."

father and Detective Mackie, that the probation conditions were "overbroad," and that the trial judge should not have required him to register as a sex offender. The Court of Special Appeals affirmed Taylor's conviction in an unreported opinion, holding that the trial judge did not err, but even if he erred, the error was harmless, that the probation conditions were not illegal nor preserved for appeal, and that the trial judge properly required Taylor to register as a sex offender. We granted certiorari and shall affirm the conviction.

## II.  Discussion

### A.

■ The primary issue is whether the trial judge erred when he curtailed Taylor's attempted questioning of two State's witnesses to impeach the non-testifying declarant's version of events and character for truthfulness.  Taylor asserts that he should have been permitted to question the father and Detective Mackie regarding B.D.'s history of lying about his prior sexual experiences, because the questions had impeachment value bearing on B.D.'s veracity and therefore are not affected by the extrinsic evidence limitation of Rule 5–608(b) or by the fact that B.D. did not testify.  Essentially, Taylor argues that Rule 5–806 treats non-testifying declarants and those that testify alike, for to do otherwise would allow the State to insulate key statements from prior act impeachment by presenting those statements through other witnesses rather **than** by calling the declarant to the stand.  The State asserts that the trial court properly curtailed Taylor's questioning, because Taylor's questions constituted the introduction of extrinsic evidence in contravention of Rule 5–608(b).

Although we have not had occasion previously to address the confluence of Rules 5–806 and 5–608(b), because Rule 5–806 allows for the impeachment of a hearsay declarant "by any evidence which would be admissible for those purposes if the declarant had testified as a witness," we necessarily must begin our analysis with the critical question: *if B.D. had testified,* would and should Taylor have been permitted under

Rule 5–608(b) to impeach him with the use of similar questions asked of B.D.'s father and Detective Mackie?

We had occasion to explore the origins of Rule 5–608(b) in the case of *State v. Cox,* 298 Md. 173, 468 A.2d 319 (1983). There, Cox was convicted of rape in the first degree, sexual assault in the first degree and common law assault in a trial in which the victim's identification of Cox was the only direct evidence linking Cox to the crime. During cross-examination of the victim, Cox sought to establish that the victim was lying by asking her about a prior accusation of criminal assault that she had recanted, but the trial judge sustained the State's objection. In determining that the trial judge erred, we discussed impeachment using prior acts and explained the extrinsic evidence limitation:

> This Court has recognized as a general rule that a witness may be cross-examined "on such matters and facts as are likely to affect his credibility, test his memory or knowledge, show his relation to the parties or cause, his bias, or the like." The exception to this rule is that cross-examination will not be permitted on matters that are immaterial or irrelevant to the issue being tried. In this regard, the trial judge plays a significant role; for he must balance the probative value of an inquiry against the unfair prejudice that might inure to the witness. Otherwise, the inquiry can reduce itself to a discussion of collateral matters which will obscure the issue and lead to the fact finder's confusion. To assist the trial judge, our courts have recognized and enforced certain principles. We have permitted extrinsic evidence of a prior conviction of a character witness or the defendant himself to be introduced to question the veracity and credibility of the witness or the defendant. However, we have insisted that the prior conviction should be relevant to the inquiry. We have indicated that "infamous crimes, felonies, crimes involving moral turpitude, deceit, or dishonesty are ... admissible for purposes of impeachment...." But generally, we have reposed the responsibility for determining the relevance of prior convictions used for impeachment in the discretion of the trial judge.

We have also permitted a witness to be cross-examined about prior bad acts which are relevant to an assessment of the witness' credibility. We have allowed such inquiry to be conducted when the trial judge is satisfied that there is a reasonable basis for the question, that the primary purpose of the inquiry is not to harass or embarrass the witness, and that there is little likelihood of obscuring the issue on trial. We recognize that in cases regarding prior misconduct, the cross-examiner is bound by the witness' answer and, upon the witness' denial, may not introduce extrinsic evidence to contradict the witness or prove the discrediting act. The witness is not disadvantaged because there is nothing for him to rebut. Thus, the inquiry virtually stops with the question and answer, except to the extent that the trial judge may allow further cross-examination to refresh the witness' recollection.

We have also been steadfast in holding that mere accusations of crime or misconduct may not be used to impeach. The rationale for this viewpoint is obvious. First of all, accusations of misconduct are still clothed with the presumption of innocence and receiving mere accusations for this purpose would be tantamount to accepting someone else's assertion of the witness' guilt and pure hearsay. In the instant case, defense counsel was not inquiring into prior convictions or an accusation of misconduct but seeking to determine the fact of prior misconduct. Under such circumstances, it is the responsibility of the trial judge to determine the relevance and materiality of the alleged prior misconduct, for it is purely collateral to the issue on trial and should only be admitted if probative of a lack of credibility. The trial judge must constantly be alert to make certain that the probative value of the inquiry outweighs its potential prejudice to the witness and that the inquiry does not stem primarily from a desire to harass or embarrass the witness.

\* \* \*

The issue we must resolve is rather straightforward: to what extent may the testimony of a prosecuting witness in a

rape case be impeached on cross-examination? We have already stated the general rule that any witness may be cross-examined on matters and facts affecting his credibility, so long as such facts are not immaterial or irrelevant to the issue being tried.

*Id.* at 178–81, 468 A.2d at 321–22 (internal citations omitted). In language probative of the resolution of the conflict between the now-codified Rule 5–608(b) and Rule 806, Judge Harry A. Cole, speaking for the Court, determined that the trial judge had erred by limiting defense counsel's inquiry:

Defense counsel's inquiry focused on the fact of prior misconduct when the witness had actually lied under oath in a similar situation. Counsel's proffer indicated a proper line of cross-examination since the information to be extracted from the witness would relate to her character for veracity and thereby allow the fact finder to assess her credibility. Of course, if the witness denied the prior misconduct, the examiner would be bound by her answer, in that, he could not introduce extrinsic evidence to prove the discrediting acts.

While the right to cross-examine is not absolute and may be restricted by the trial judge, such restriction should be manifested by the exercise of sound discretion. As Chief Judge Murphy (then Chief Judge of the Court of Special Appeals) said in *DeLilly v. State*[, 11 Md.App. 676, 276 A.2d 417 (1971)]:

We are, of course, mindful of the general rule so frequently cited that the allowance or disallowance of questions on cross-examination is normally left to the sound discretion of the trial judge. But where the limitations imposed by the court upon cross-examination are such as plainly inhibit the ability of the accused to obtain a fair trial, the general rule is manifestly inapplicable. The real object of cross-examination is "to elicit all the facts of any observation or transaction which has not been fully explained." That a witness may be cross-examined on such matters and facts as are likely to affect his credibility, test his memory or knowledge or the like, is a fundamental con-

cept in our system of jurisprudence. And cross-examination to impeach, diminish, or impair the credit of a witness is not confined to matters brought out on direct examination; it may include collateral matters not embraced in the direct examination to test credibility and veracity, it being proper to allow any question which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character, or credibility. Of course, the right to cross-examine effectively necessarily includes the right to place the testimony of a witness in its proper setting to fairly enable the jury to judge its credibility.

Here the inquiry had substantial probative force and there was no indication that defense counsel was harassing the witness by asking an unfounded question or seeking primarily to embarrass the witness. Indeed, the proffered question would have gone to the very heart of the witness' credibility. The evidence of the crime was extremely damaging and Cox's defense necessarily rested on the fact finder not believing the prosecutrix's statement that he was her assailant.

*Id.* at 183–184, 468 A.2d at 323–24 (internal citations omitted). Thereby, in *Cox*, we presaged our adoption of Rule 5–608(b), permitting the witness to be questioned regarding lies about prior misconduct, with the limitation that proof of the conduct itself, or extrinsic evidence, could not be introduced.

Subsequently, in *Merzbacher v. State*, 346 Md. 391, 697 A.2d 432 (1997), we had occasion to explore Rule 5–608(b), when we were confronted by the issue of whether a third party could testify that a victim, who had already testified, previously had reported another act of abuse by one other than Merzbacher, to prove the victim's tendency to make such complaints. In that case, where the victim had not been questioned about whether she had falsely accused another, we were clear that Merzbacher could have questioned the victim about false accusations that may have been probative of lack of credibility, but could not have proven the prior misconduct extrinsically:

Although Merzbacher believes his attempt to show Murphy's propensity to falsely accuse others of sexual misconduct is supported by our holding in *State v. Cox,* we disagree. In *Cox,* this Court reversed a defendant's conviction of rape and related offenses because the trial court erroneously precluded his defense counsel from asking the prosecutrix about an incident where *that* witness had allegedly lied under oath. Because the testimony of the witness was pivotal to the State's case, we concluded that it was error to preclude the defense from questioning her about that specific instance of past misconduct which was highly relevant to her credibility. We also noted, however, that had that witness denied the prior misconduct, the examiner would have been bound by the answer and precluded from introducing extrinsic testimony to prove the discrediting acts.

In the instant case, Murphy was not questioned about whether or not she made false accusations against another person. Rather, Merzbacher attempted to impeach her credibility through the introduction of highly speculative and unproven extrinsic testimony suggestive of her tendency to make such accusations. Merzbacher failed to produce evidence of a complaint made by Murphy other than that made against Merzbacher, much less one that was false. This is precisely the issue our predecessors explored in *Rau v. State*[, 133 Md. 613, 105 A. 867 (1919)]. Rau, charged with having carnal knowledge of a women child under the age of fourteen years, asked the following question of the child's father at trial:

> I want to ask you, Mr. Lohmeyer [the victim's father], if your daughter Martha, the prosecutrix in this case, didn't tell you that a man by the name of Hutton, a neighbor across the road where you lived about a year ago, that about that time, that this Mr. Hutton had sexual intercourse with her, and if she didn't thereafter tell you that it was not so and that she had told a lie on Hutton ...?

The State's objection to the question was sustained. In response, Rau asserted that "the question was proper be-

cause [it] ... would have [had] a tendency to impeach her character,"—an assertion, we note, identical to Merzbacher's.

In rejecting Rau's argument, the Court noted that

> the prosecuting witness was not asked on cross-examination whether she had told a lie concerning the alleged intercourse with Hutton, ... but whether or not she had told her mother a year ago that a man by the name of Horton, a neighbor of hers, had sexual intercourse with her.

The Court thus concluded that because "it is almost universally held that proof of particular facts is inadmissible in impeaching a witness ... there was no error in the [trial] [c]ourt in refusing to permit the question to be asked and answered."

We noted in *Cox* that although *Rau* would have been well within his rights to ask the prosecutrix questions concerning her credibility on cross-examination, he was not permitted "to broach the subject through extrinsic testimony." Nothing has changed since *Rau*. Indeed, Maryland Rule 5–608(b) codifies the rule applied in *Cox* and *Rau*[.]

\* \* \*

*Assuming that he had a reasonable basis to do so, Merzbacher could have questioned Murphy about prior instances of her falsely accusing another individual of sexual misconduct. Although we agree that any such false accusation would have had a significant bearing on Murphy's credibility, Merzbacher was not entitled to introduce extrinsic testimony to support his attempted exploration of Murphy's character through prior bad acts evidence. The trial court did not err or otherwise abuse its discretion by excluding this line of questioning.*

*Id.* at 417–20, 697 A.2d at 445–46 (internal citations omitted) (footnote omitted) (emphasis added). In stating that "Merzbacher could have questioned Murphy about prior instances of her falsely accusing another individual of sexual misconduct," but could not have introduced proof of the complaints, we

acknowledged that the purpose of the extrinsic evidence limitation in Rule 5–608(b) is to prevent a mini-trial regarding a collateral matter while permitting questions to impeach with prior false accusations. *Id.*; *see also* 6 Lynn McClain, Maryland Practice: Maryland Evidence State and Federal § 608:1(c) (2d ed. 2001, 2008 Supp.) ("Because the bad acts evidence is not central to the trial, the consumption of time and the distraction of the jury which would result from a mini-trial about whether the bad act took place dictate inadmissibility of extrinsic proof.").

As a result, the resolution of the issue presented necessarily entails a determination of whether, under Rule 5–608(b), Taylor could have impeached B.D. with the same questions proffered to B.D.'s father and Detective Mackie, a prerequisite to any consideration of Rule 5–806. Here, Taylor attempted to question B.D.'s father about whether B.D. had a history of lying about his sex life, but the trial judge sustained the State's objection before the father answered. As in *Merzbacher*, where we stated that Merzbacher could have asked Murphy whether she previously had made false accusations because the question implicated her credibility under Rule 5–608(b), had B.D. testified, Taylor would have had the opportunity to question B.D. about whether B.D. previously had lied about his sexual encounters. Similarly, under the extrinsic evidence limitation, if B.D. had answered "no," Taylor could not have proven the misconduct itself.

Taylor also had proffered that he would have asked Detective Mackie whether B.D. ever had lied about prior sexual activity and whether B.D. had lied regarding the fact that his sexual encounter with Taylor was his first, although, on the tape of the interview, B.D. had been inconsistent about the encounter's primacy. Again, had B.D. testified, Taylor could have asked B.D. whether he had lied about his sexual encounters or about this incident, because those questions would have borne directly on B.D.'s character for truthfulness—and again, if B.D. had answered "no," Taylor would have been bound by that answer.

B.D. did not testify, however, and Taylor was not afforded the opportunity to impeach B.D. under Rule 5–608(b), because the State introduced B.D.'s version of events through the father and Detective Mackie. In essence, we are concerned here with whether the State can successfully avoid the impeachment of B.D.'s veracity by never calling him to the stand. The answer is no, under the dictates of Rule 5–806, which allows the impeachment of a declarant "by any evidence which would be admissible ... if the declarant had testified as a witness." For us, this is a question of first impression, although not so in a number of federal courts, which have had occasion to explore the scope of Rule 806 of the Federal Rules of Evidence, which is similar in important respects to Maryland Rule 5–806.[8] In each of the cases, the courts have indicated that Federal Rule 806 would permit impeachment of a non-testifying declarant, but not proof of prior misconduct.

*United States v. White,* 325 U.S.App.D.C. 282, 116 F.3d 903 (D.C.Cir.1997), involved a complicated multi-defendant, multi-count murder and conspiracy case, in which a key government witness, Williams, was allegedly killed by Hughes and White to prevent Williams' cooperation with the police. Because Williams was killed, the trial judge permitted Williams' police contact, Sergeant Sutherland, to testify as to drug transactions involving Williams and regarding what Williams had told

---

**8.** Rule 806 of the Federal Rules of Evidence states:

When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

The only distinction between Federal Rule 806 and Maryland Rule 5–806 is that the words "or a statement defined in Rule 801(d)(2)(C), (D), or (E)," in the first sentence of the Federal Rule, do not appear in the Maryland Rule.

the officer about the "First Street Crew" drug organization, which consisted of co-conspirators White, Hicks, Hughes, Hutchinson, and Ballard, among others. Defense counsel attempted to impeach Williams' version of events, using Federal Rule 806, by asking Sergeant Sutherland about Williams' drug use, drug dealing and prior convictions, as well as about whether Williams had lied on an employment application or violated any court orders. The trial judge permitted questioning about drug use, drug dealing and prior convictions, but did not allow the introduction of the employment application or court order, and White appealed. In affirming the conviction, the United States Court of Appeals for the District of Columbia Circuit acknowledged that proof of prior acts was different than questioning a witness regarding whether Williams, the non-testifying declarant, had lied previously; the Court noted that Federal Rule 806 would have permitted the latter:

> Although Fed.R.Evid. 806 provides that the credibility of a hearsay declarant "may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness," counsel attacked Williams's credibility using specific examples of misconduct, which, under Fed.R.Evid. 608(b), cannot be proved by extrinsic evidence. Accordingly, Hughes counsel could have asked Sergeant Sutherland only if Williams had ever lied on an employment form or violated any court orders, and could not have made reference to any extrinsic proof of those acts. Having known Williams for less than two months before his death, Sutherland may or may not have been able to answer those questions. In light of the damage already done to Williams's credibility through Sutherland's testimony about Williams's drug use, drug dealing, and prior convictions, the district court was within its discretion to conclude that the questions were of little utility.

*Id.* at 920 (internal citations omitted).

In *United States v. Saada,* 212 F.3d 210, 221 (3rd Cir.2000), the United States Court of Appeals for the Third Circuit also had occasion to address the application of Federal Rule 806,

when a non-testifying declarant's version of events is attacked. *Saada* involved a false insurance claim made by warehouse owners after of one of them allegedly broke a sprinkler-head to create a flood. The warehouse owners claimed that the flood was an accident and introduced, over the government's objection, the utterances of a former New Jersey state court judge, who was in the warehouse at the time of the flood, and who had stated, "oh my God, Neil did something stupid ... now he's got a mess ... I can't believe it. He is so stupid. He threw it. He is stupid, he is dumb." *Id.* at 218. The judge had died, and the government sought to impeach by asking the trial judge to take judicial notice of two New Jersey Supreme Court orders disbarring and removing the state judge from the bench for unethical conduct. Over defense counsel's objection, the trial judge took judicial notice of the orders.

■ On appeal, Saada argued that the judicially noticed orders constituted proof of the judge's misconduct, which was barred under the extrinsic evidence limitation of Federal Rule 608(b). The Court of Appeals for the Third Circuit, relying on *White*, held that the orders were extrinsic evidence, and therefore, should not have been admitted; although the judge's version of events and veracity could have been impeached by more specific questioning regarding veracity:

> [T]he unavailability of the declarant will not always fore-close using prior misconduct as an impeachment tool because the witness testifying to the hearsay statement may be questioned about the declarant's misconduct—without reference to extrinsic evidence thereof—on cross-examination concerning knowledge of the declarant's character for truthfulness or untruthfulness.

*Id.* at 221. *See also United States v. Friedman,* 854 F.2d 535, 570 n. 8 (2d Cir.1988) (noting the tension between the extrinsic evidence limitation in Federal Rule 608(b) and Federal Rule 806 when the declarant does not testify).[9]

---

**9.** In *State v. Martisko,* 211 W.Va. 387, 566 S.E.2d 274, 276 (2002), the Supreme Court of Appeals of West Virginia even permitted extrinsic

Within this framework, based upon our determination that Taylor could have asked B.D. under Rule 5–608(b) whether he had lied about sexual matters on previous occasions, we hold that Rule 5–806 would permit the same questions to be addressed to B.D.'s father and the detective. To hold otherwise, would be to permit the State to insulate a non-testifying declarant from impeachment, by presenting his statements through other witnesses, instead of by calling the declarant to the stand; this we will not permit under Rule 5–806.

## B.

Having concluded that the trial judge erred, we now turn to whether the trial judge's error was harmless. We recently addressed the application of the harmless error rule in *Bellamy v. State*, 403 Md. 308, 332–33, 941 A.2d 1107, 1121 (2008) (internal citations omitted), when Judge Glenn T. Harrell, Jr., writing for the Court, noted:

> In *Dorsey v. State*, ... we adopted the test for harmless error announced by the Supreme Court in *Chapman v.*

---

evidence to prove the underlying act under West Virginia Rule 806, which is identical to Federal Rule 806, despite the limitation in Federal Rule 608(b). There, Martisko sought to introduce evidence that his girlfriend, who did not testify and whose statements were presented by the state through a hearsay exception, had accused a prior boyfriend of domestic violence on a previous occasion and later recanted. The trial judge prevented Martisko from proving the prior act either by recalling police witnesses to question them about it or by introducing the report of the incidents. On appeal, the Supreme Court of Appeals of West Virginia held that the evidence should have been permitted under West Virginia Rule 806, because to apply the extrinsic evidence limitation under the circumstances would be to impinge upon Martisko's right to cross-examine his accuser and to receive a fair trial:

> We are uncomfortable with a conviction based entirely upon hearsay evidence where the defendant has had no opportunity to impeach his chief accuser. In light of the law's strong preference for live testimony ... and in light of the confusing tension between Rules 806 and 608, we feel that under the facts of this case, Mr. Martisko should have been permitted to impeach the credibility of Ms. Madden either by introducing the documents in question or by re-calling the police witnesses and questioning them about their knowledge of Ms. Madden's prior acts.

*Id.* at 294–95, 566 S.E.2d 274 (internal citations omitted) (footnote omitted). We need not address the *Martisko* rationale in this case.

*State*[, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]. . . .
As adopted in *Dorsey*, the harmless error rule is:

> When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of-whether erroneously admitted or excluded-may have contributed to the rendition of the guilty verdict.

In performing a harmless error analysis, we are not to find facts or weigh evidence. Instead, "what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury . . . to determine." " 'Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility beyond a reasonable doubt.' " " 'To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' " The "harmless error rule . . . has been and should be carefully circumscribed." Harmless error review is the standard of review most favorable to the defendant short of an automatic reversal.

Application of these tenets to the present case, leads us to the conclusion that the trial judge's error was harmless.

Taylor was acquitted of the fellatio count and convicted of the anal intercourse count. To split the verdict and to acquit Taylor of the fellatio count, the jury must have disbelieved B.D. regarding the fellatio count. It is noteworthy that Taylor's counsel, when explaining to the trial judge why he should have been allowed to probe into prior occasions in which B.D. had lied, stated, "I mean the [fellatio] charge is based solely on what [B.D. is] claiming. And if we cannot

show that when it comes to sexual matters, that this witness will lie, that [sic] I think the jury won't have the full picture."

Taylor's counsel clearly had ample opportunity to impeach B.D.'s version of events and his character for truthfulness. During cross-examination of B.D.'s father, Taylor elicited that B.D. lied about his whereabouts after his school planner had been discovered in a Silver Spring Metro Station. Taylor also questioned the father about whether B.D. had been honest with him in the past about his sexual experiences:

[DEFENSE COUNSEL]: Okay. So, tell me this. [D]o you think your son would be completely honest with you in discussion [sic] his sex life?

[FATHER]: Since this incident, yes. He has been.

[DEFENSE COUNSEL]: Okay. So since this incident, you believe he's been completely honest?

[FATHER]: Yes. I have.

[DEFENSE COUNSEL]: But before this incident, you believe he hadn't?

[FATHER]: I think he was very vague about it.

When cross-examining B.D.'s mother, Taylor was permitted to ask her whether she believed that B.D. told her everything that night, to which she answered that she did not believe that B.D. had told her everything. Taylor intimated throughout the cross-examination of both the mother and father and in closing, that B.D. had fabricated or changed his version of events for fear of physical confrontation with his father. Moreover, during the cross-examination of Detective Mackie, Taylor questioned her about whether B.D. had "told her the truth throughout the whole interview with him." Taylor also had the opportunity to impeach B.D.'s version of events when cross-examining Nurse Bresee, by eliciting B.D.'s inconsistent version of events regarding oral or anal ejaculation.

In convicting on the anal intercourse count, the jury not only had B.D.'s statements about anal intercourse, but also had evidence of Nurse Bresee's physical examination, in which she observed a half-inch tear on the exterior of B.D.'s anus, along with Taylor's DNA, recovered from the swabs of B.D.'s

anus. The substantial physical evidence on the anal intercourse count distinguished that count from the fellatio count and led the jury to convict on the anal intercourse count. The trial judge's error, therefore, was harmless.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

Dissenting opinion by BELL, C.J., which ELDRIDGE, J., joins.

BELL, Chief Judge, dissenting in which ELDRIDGE, J., joins.

Todd Tyrone Taylor, the petitioner, was charged in the Circuit Court for Montgomery County with two counts of third-degree sexual offense for allegedly engaging in anal intercourse and fellatio with B.D., a 15 year old male. At trial, the State chose not to call B.D. to the stand to prove its case. Instead, it called witnesses to whom B.D. had related his story and used scientific and other circumstantial evidence for that purpose. Taylor sought to impeach B.D., a non-testifying hearsay declarant, by presenting the jury with evidence, through some of the witnesses the State called, that B.D. frequently lied when discussing his sexual history. By presenting this evidence, Taylor hoped to undermine the scientific evidence, which was dependent substantially on B.D.'s credibility. His strategy was to demonstrate to the jury that the conclusions reached by the State's expert witnesses were not reliable because they were premised on the statements of a declarant who was not credible. The trial court ruled that Taylor's attempt to impeach B.D. by cross-examining State's witnesses was not permitted under Md. Rule 5–608(b).[1]

---

1. Md. Rule 5–608. Evidence of Character of Witness for Truthfulness or Untruthfulness.
   * * *

I agree with the majority's holding that, pursuant to Md. Rule 5–806,[2] Taylor should have been permitted to impeach B.D. through the State's witnesses that were called. Specifically, I agree that Md. Rule 5–608(b) does not pose a bar to the impeachment of a non-testifying hearsay declarant's veracity when the State chooses not to call the declarant, because Md. Rule 5–806 permits the impeachment of a non-testifying declarant through testifying witnesses, which is the exact method of impeachment Taylor was erroneously prevented from using at trial. Majority slip op. at 33. As the majority correctly points out, "[t]o hold otherwise, would be to permit the State to insulate a non-testifying declarant from impeachment, by presenting his statements through other witnesses, instead of by calling the declarant to the stand." Majority slip op. at 28–29. I do not agree with the majority's conclusion that the trial court's error in refusing to allow the impeachment attempted in this case was harmless beyond a reasonable doubt. Therefore, I dissent.

The jury reached a split verdict at Taylor's trial, finding him guilty of the anal intercourse count but not guilty of the

*(b) Impeachment by Examination Regarding Witness's Own Prior Conduct Not Resulting in Convictions.* The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.

2. Md. Rule 5–806. Attacking and Supporting Credibility of Declarant
*In General.* When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.
*Exception.* This Rule does not apply to statements by party-opponents under Rule 5–803(a)(1) and (a)(2).

fellatio count. The Court of Special Appeals affirmed Taylor's conviction in an unreported opinion. It is undisputed that on September 22, 2004, B.D. visited Taylor's apartment. The issue for the jury to determine, however, was whether Taylor and B.D. had illegal sexual contact with each other in Taylor's apartment, as B.D., through the witnesses that the State called, maintained, or, whether, as the petitioner claimed, Taylor and B.D. merely masturbated individually.

B.D.'s version of the facts was presented as indicated, through several witnesses. Bicie Walker, his mother, testified that B.D. admitted going to Silver Spring, Maryland and having a sexual encounter with another man. Marvin D., B.D.'s father and Ms. Walker's ex-husband, testified that he demanded to be, and was taken, by B.D. to the apartment where the sexual encounter occurred, where they met law enforcement officials, who directed them to give statements to Detective Deana Mackie, an officer in the Family Crimes Division.

Detective Mackie confirmed that B.D. maintained that he had sex with the petitioner in his apartment. Heidi Bresee, a Forensic Nurse Examiner, conducted a sexual assault examination of B.D. That examination revealed an acute half-inch tear in B.D.'s anal verge that was consistent with a penile penetration at the time in which B.D. claimed to have had anal sex with Taylor. Bresee also collected swabs of possible forensic evidence from the inside of B.D.'s mouth, rectum and perianal buttocks as part of B.D.'s rape kit, also known as a physical evidence recovery kit ("PERK"). She also testified to what B.D. told her:

"He stated to me, I met this guy Tony in a telephone chat room. We agreed to meet and have sex. I told him I was 17 so he knew I was a minor. I went to his place after school. I performed oral sex on him first. His penis tasted weird, nasty. I spit after I did that. I can't describe but it tasted gross. Maybe like he'd had sex with someone else before I got there. Then he had anal sex with me. He put his finger and his penis in my butt. He didn't wear a condom. I don't think he put anything on his penis. It

hurt a little but not bad. When my mom found out, she called the police."

Finally, Bresee indicated that B.D. told her that he had a bowel movement after his "encounter" with Taylor.

Karolyn Tontarski, a Forensic Scientist, analyzed the swabs collected by Bresee, finding that the "perianal" and "rectal swabs" contained Taylor's DNA.[3] The amount of sperm cells found on B.D.'s perianal and rectal swabs was consistent, Tontarski stated, with an internal ejaculation. That conclusion assumed that the bowel movement that B.D. testified he had, after his sexual encounter, had been a large bowel movement. She conceded, on cross-examination, in that regard, that had B.D. had only a light bowel movement, it might be possible, although she thought highly unlikely, for the semen to have been deposited by an inanimate object.

Taylor testified in his own defense and vehemently denied B.D.'s version of events.[4] While agreeing that B.D. came to his house in response to a message he left on an adult gay hotline that was for adults only, he disputed that he had sex with him. According to Taylor, he agreed only to watching a pornographic tape on his bed while he and B.D., individually and separately, masturbated. Nothing more occurred, he maintained.

When he ejaculated on his chest and stomach, Taylor stated, B.D., who was lying next to him, reached over and wiped the semen off of Taylor's chest and stomach with his right hand, after which Taylor testified that he noticed B.D. putting his

---

**3.** As to the swabs that Bresee took from the inside of B.D.'s mouth, Tontarski testified that she was not able to "obtain any conclusive DNA typing results on what we call the sperm fraction."

**4.** According to Taylor, B.D. deceitfully used the hotline's services, responding to Taylor's message as a 21 year-old student at George Washington University. Taylor also complained that B.D. provided a flattering physical description of himself. Taylor also testified that he never suspected that B.D. was underage, but found it suspicious that B.D.'s actual appearance did not match the description that B.D. gave over the phone. Therefore, he testified that he repeatedly tried to persuade B.D. to leave, but B.D. was determined to have sex.

right hand in between his buttocks and using his left hand to masturbate himself. Although he admitted that he did not see B.D. use his fingers to penetrate his rectum, Taylor stated emphatically and, therefore, was absolutely certain, that the half-inch tear in B.D.'s anal verge was not caused by his penis because he never penetrated B.D. Taylor testified that, while B.D.'s behavior was "freaky," he did not find it "weird." Gay men, he explained, occasionally engage in this type of conduct for sexual pleasure and satisfaction.

## I.  Harmless Error Rule

In *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976), this Court outlined the test for harmless error in criminal cases:

> "We conclude that when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed harmless and a reversal is mandated.  Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict."

Prior to *Dorsey*, this Court cautioned that the harmless error rule "should be carefully circumscribed" to discourage prosecutors from testing the bounds of our evidentiary rules in hopes of a reviewing court simply finding the error harmless in light of the substantial evidence of the defendant's guilt.  *Younie v. State*, 272 Md. 233, 248, 322 A.2d 211, 219 (1974)(quoting *People v. Jablonski*, 38 Mich.App. 33, 38–39, 195 N.W.2d 777, 780 (1972)).  The majority's perfunctory harmless error analysis takes this Court one step closer to the reality of which these cases warned and, while doing so, usurps the role of the trier of fact by simply and independently reweighing the evidence.  Judges do not weigh evidence or find facts in a jury trial.  "[W]hat evidence to believe, what weight to be given it, and what facts flow from that evidence

are for the jury, not the judge to determine." *Dykes v. State,* 319 Md. 206, 224, 571 A.2d 1251, 1260 (1990).

For an appellate court to find harmless error, it must be "able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Dorsey,* 276 Md. at 659, 350 A.2d at 678. The harmless error rule is not an open invitation for the appellate court to substitute its judgment as to whether there was sufficient evidence to convict the defendant. Instead, in a jury trial, the jury or trier of fact, is the entity that the Constitution entrusts with making that determination, in the first instance. U.S. Const. amend. VI; Md. Constitution, Declaration of Rights, Article 23.[5] The court's role, as articulated in *Dorsey,* is to determine whether, beyond a reasonable doubt, the "error in no way influenced the verdict." *Id.* Given the facts presented here, it is impossible for the majority, or anyone else, to conclude, beyond a reasonable doubt, that the jury's verdict would not have been influenced had it been presented with the erroneously excluded evidence that B.D. frequently lied about his sexual past.

The trial court made two significant erroneous evidentiary rulings. The first significant error made by the trial judge was in preventing Taylor from cross-examining B.D.'s father, one of the State's main witnesses, on whether B.D. had previously lied about his sexual past. The second erroneous ruling was in preventing Taylor from playing a tape of B.D.'s interview with Detective Mackie. He proffered that the tape would have shown the following:

---

5. U.S. Const. amend. VI provides, in relevant part:
   In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation[.]
   Md. Constitution, Declaration of Rights, Article 23 provides in relevant part:
   In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction.

"Mr. Chapple: Your Honor, I have on the tape when she [Detective Mackie] interviewed him [B.D.] that she asked him, "Why do you feel bad about this?" Because she said, "Do you feel bad about this incident?" He [B.D.] said yes. He said, "Because this is my first time." And she said, "Anal sex, then?" He said yes. Later in that interview, he admits that he had anal sex with someone else previously to this. It shows that he lied about this incident and about his sexual activities[.]"

These two significant evidentiary rulings bear on, and, indeed, are critical to the assessment of the most important issue in the case, B.D.'s credibility. Their importance is accentuated by the fact that B.D. did not take the stand to testify about the alleged sexual acts that he engaged in with Taylor and so the petitioner was not able to confront him directly. Thus, the only insight the jury had, or could get, into the trustworthiness of B.D.'s testimony was through the testimony of those State's witnesses to whom past discrepancies had been revealed or who, through experiences, were aware of the victim's tendency to prevaricate. It is pertinent, in this regard, to note that those witnesses did not view the alleged sexual act and, therefore, were relating, and, so, relying on what they were told, the most critical being that related by B.D.

## II.   Application of Harmless Error Rule

The holding that the trial judge's error was harmless is premised on the majority's interpretation of the split verdict returned by the jury. It reasons that the jury had to conclude that B.D. lied when discussing his sexual past in order to reach the split verdict. Thus, according to the majority, the jury had already concluded that B.D. lacked credibility when discussing his sexual history. Necessarily, therefore, it asserts that the verdict was not impacted by the trial judge's error.

Its protestations to the contrary notwithstanding, all the majority has done is weigh the evidence itself and conclude

that there was sufficient evidence for a jury to convict Taylor. This approach, however, impinges on the province of the jury, which has the sole responsibility of "[w]eighing the credibility of witnesses and resolving any conflicts." *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323, 331 (1998). The majority's approach pays mere lip service to the harmless error standard outlined in *Dorsey.*

The jury's split verdict does not mean, necessarily or even logically, that it concluded that B.D. lacked credibility when discussing his previous sexual encounters. There are other possible reasons for the jury's split verdict. For example, the jury could have been persuaded by the absence of scientific evidence relating to the fellatio count, when compared with the seeming plethora of scientific evidence that explained and confirmed the anal intercourse count. The jury also could simply have reached a compromise verdict. "How, or why, a jury may decide to resolve credibility or fact issues in a particular manner is a matter only it knows." *Rubin v. State,* 325 Md. 552, 593, 602 A.2d 677, 697 (1992) (Bell, J., dissenting). One thing, however, is certain: it is impossible for the majority, or anyone else, to conclude beyond a reasonable doubt how the jury would have used the erroneously excluded evidence and resolved the credibility determinations that would have flowed from it.

We are not concerned here with whether the evidence is sufficient to sustain the jury's verdict. It undoubtedly is. In fact, the evidence against Taylor is fairly strong. The *Dorsey* harmless error rule, however, requires that, in order for harmless error to be found, the majority must be able to conclude beyond a reasonable doubt that the jury's verdict would not have been influenced by the erroneously excluded evidence. Thus, simply determining whether there was sufficient evidence to convict Taylor and weighing the evidence in that process is not the proper role for an appellate court. Instead, the reviewing court must be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to

the rendition of the guilty verdict. *See Rubin v. State,* 325 Md. 552, 592, 602 A.2d 677, 696 (1992) (Bell, J., dissenting).

In addition to relying on an interpretation of the jury's split verdict, which it is not at all clear that the jury used, the majority leans too heavily on the expert testimony of Nurse Bresee and Karolyn Tontarski. This Court has recognized that an expert's opinion "derives its probative force from the facts on which it is predicated," *State Dep't of Health v. Walker,* 238 Md. 512, 520, 209 A.2d 555, 559 (1965), and is no stronger. *Jones v. State,* 343 Md. 448, 461, 464, 682 A.2d 248, 255–56 (1996). It is significant, therefore, that Nurse Bresee conceded that her interpretation of the observations that she made during B.D.'s sexual assault examination was influenced by B.D.'s version of events.[6] Thus, Nurse Bresee's and Karolyn Tontarski's expert opinions are only as good as the foundation—the factual context and the credibility B.D. provides for their observations—that undergirds their expert opinions. Because an expert's opinion is only as good as the factual predicate on which it is based, Maryland juries are not required to give an expert's opinion any weight at all. *See* Md.Crim. Pattern Jury Instr. 3:14 (2003).[7]

The scientific testimony presented to the jury could have been interpreted by the jury as consistent with either Taylor's

---

**6.** On cross-examination, Nurse Bresee stated the following:

[Defense Counsel]: Okay. You have no first hand knowledge of what happened to Brandon D., is that correct?

[Nurse Bresee]: I was not at the scene. No. I go based on what the patients report.

[Defense Counsel]: So, your testimony is based on what he told you that happened earlier that day, correct?

[Nurse Bresee]: That is correct.

**7.** *MPJI—Cr 3:14: EXPERT OPINION TESTIMONY*

An expert is a witness who has special training or experience in a given field. You should give expert testimony the weight and value you believe it should have. You are not required to accept any expert's opinion. You should consider an expert's opinion together with all the other evidence. In weighing the opinion of an expert, you should consider the expert's experience, training and skills, as well as the expert's knowledge of the subject matter about which the expert is expressing an opinion.

or B.D.'s version of events. Just as the weight to be given the expert's testimony is for the jury to decide, how to strike the balance and assess a witness's credibility is to be left to the jury.[8] Therefore, because it is the jury that determines the matter, that one interpretation is logically stronger, is not dispositive.

Taylor's strategy was to undermine B.D.'s credibility.[9] By doing so, the scientific conclusions reached by Nurse Bresee

---

**8.** The importance of testing an accuser's credibility was highlighted in *State v. DeLawder*, 28 Md.App. 212, 344 A.2d 446 (1975), where the Court of Special Appeals, in a postconviction proceeding, held that the Supreme Court's decision in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) warranted granting DeLawder a new trial. Lee Franklin DeLawder, on re-trial, was convicted of carnal knowledge of a female under the age of 14. *DeLawder*, 28 Md.App. at 213, 344 A.2d at 447. At trial, DeLawder's strategy was to show the jury that the prosecutrix falsely claimed she was raped by him because she thought she was pregnant and feared having to tell her mother that she was pregnant as a result of her voluntary sexual activity. *DeLawder*, 28 Md.App. at 220, 344 A.2d at 451. In order for DeLawder's strategy to succeed, he attempted to introduce evidence that the prosecutrix had engaged in prior acts of sexual intercourse. The trial judge correctly refused to allow DeLawder to introduce this evidence under then existing legal precedent. *DeLawder*, 28 Md.App. at 215, 344 A.2d at 448. The Supreme Court's subsequent decision in *Davis*, however, required that DeLawder be allowed to attack the prosecutrix's credibility in order to preserve his Sixth Amendment Confrontation Right. *DeLawder*, 28 Md.App. at 227, 344 A.2d at 454–55. In applying the *Davis* decision, the *DeLawder* court recognized, unlike the majority here, that the credibility of a witness, especially one that is essential to the State's case, is everything, and that an appellate court "cannot speculate ... as to whether the jury, as the sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to present it fully." *DeLawder*, 28 Md.App. at 226, 344 A.2d at 454. This same appreciation for the fragility of credibility determinations made by the jury should have resulted in Taylor receiving a new trial. Unfortunately, the majority has taken upon itself to usurp the role of Taylor's jury and conclude that there was enough evidence to uphold his conviction.

**9.** In *State v. Cox*, 298 Md. 173, 468 A.2d 319 (1983), this Court held that a defendant should be permitted to impeach a prosecutrix concerning prior misconduct in the form of a false accusation against another individual. In *Cox*, the defendant attempted to impeach the prosecutrix's credibility by inquiring about a previous accusation of assault that she made against another individual, which she later recanted. *Cox*, 298 Md. at 177, 468 A.2d at 320. The trial judge prohibited Cox from

and Karolyn Tontarski, who both based their conclusions on B.D.'s version of events, similarly would be undermined. Nurse Bresee testified that she observed an acute half-inch tear on B.D.'s anal verge. On cross-examination, Nurse Bresee gave contradictory testimony about whether it was possible for a finger to cause the tear that she observed outside of B.D.'s anus. On cross-examination, Nurse Bresee testified, in part, to the following:

> [Defense Counsel]: So you testified that a finger could not make this tear. It was unlikely that a finger could make that tear, is that correct?
>
> [Nurse Bresee]: In my experience it is unlikely. That's correct.
>
> [Defense Counsel]: Okay. But it's possible?
>
> [Nurse Bresee]: It's possible.
>
> * * * *
>
> [Defense Counsel]: Okay. Well, what I'm asking you is, is it possible that someone can use a finger and the fingernail can scratch the outside of the rectum?
>
> [Nurse Bresee]: I'm stating it's not my opinion that you could cause a half inch tear by a fingernail.

---

cross-examining the prosecutrix on this matter, and he eventually was convicted of numerous sexual offenses and sentenced to life imprisonment. *Cox,* 298 Md. at 175–77, 468 A.2d at 320–21. We reversed Cox's conviction and rejected the State's argument that prohibiting Cox from impeaching the prosecutrix's credibility on her prior false accusation was harmless. *Cox,* 298 Md. at 184–85, 468 A.2d at 324–25. In holding that the trial judge's error was not harmless, we noted that "[d]espite some corroborating physical evidence, the prosecution's case against Cox was based on the testimony of the victim." *Cox,* 298 Md. at 185, 468 A.2d at 324. Consequently, the prosecution against Taylor was based almost entirely on B.D.'s testimony which was articulated through the State's witnesses. Just like in *Cox,* B.D.'s credibility was critical to the State's case. When the trial judge erroneously prevented Taylor's jury from hearing evidence that B.D. had a history of lying about his sexual past, the trial judge essentially guaranteed a guilty verdict for Taylor. This Court's refusal to vacate Taylor's conviction and grant him a new trial, in my opinion, only demonstrates the failure of the majority to appreciate the important role that credibility plays in a jury's interpretation of the evidence.

[Defense Counsel]: All right. Okay. I'm asking you is it possible, not—

[Nurse Bresee]: Then no.

Nurse Bresee's statement that a finger could have made the tear that she observed in B.D.'s anal verge is helpful to Taylor. It provides a basis for the jury to credit his version of the events. Her later statement, perhaps an attempt to retract her earlier statement, does not negate that fact. Her later statement simply stated that a fingernail could not have made the tear. At no time did she retract her testimony that a finger "possibly" may have done so.

The forensic scientist testified that she performed DNA typing on the swabs that Nurse Bresee took from B.D.'s mouth, anus and rectum, finding Taylor's DNA only on both the perianus and rectal swabs. She conceded on cross-examination, however, that it was possible for an inanimate object, such as a finger, to have deposited the semen that she observed on the perianal and rectal swabs taken from B.D. To be sure, she qualified that it was "highly unlikely" that it could have occurred that way, but how likely it was was for the jury to decide.

The scientific evidence presented to the jury relied significantly, if not entirely on B.D.'s credibility. If the jury believed B.D., that he had anal sex with Taylor, the scientific testimony supported that version of events. The jury did not have to believe B.D., however. Tontarski's testimony that the amount of semen on the perianal and rectal swabs taken from B.D. was consistent with an internal ejaculation, was premised on B.D.'s testimony that he had a bowel movement after his sexual encounter with Taylor. Nurse Bresee's testimony about whether it was possible for a finger to cause the acute half-inch tear she observed on B.D.'s anal verge was conflicting. The scientific testimony favorable to B.D. would be valid, therefore, only if B.D. was credible. If the jury did not believe B.D., the scientific testimony could be interpreted consistently with Taylor's version of events. For instance, with regard to the DNA in B.D.'s anal and rectal area, Taylor

testified that B.D. placed semen he got from Taylor's stomach and chest in between his own buttocks. Although Taylor did not testify that B.D. used his fingers to penetrate himself with Taylor's semen, he did deny emphatically that he caused the tear in B.D.'s anal verge. Significantly, Tontarski's testimony that it was possible for a finger to have deposited the semen when coupled with Nurse Bresee's concession, made B.D.'s credibility quite important.

Had the jury been given the opportunity to hear that B.D. previously lied to his father about his sexual past and to listen to the tape of B.D.'s statement to Detective Mackie about his sexual history, it might have had a different perspective on the scientific testimony, which likely might have resulted in a different verdict. As Nurse Bresee admitted on cross-examination, her interpretation of the observations that she made during her sexual assault examination of B.D. was based largely on B.D.'s version of events. Thus, without B.D.'s story, Nurse Bresee lacked any factual context to interpret her observations. Thus, B.D.'s credibility played a pivotal role for the jury, as well as for Nurse Bresee and Karolyn Tontarski, in determining how to interpret the scientific evidence.

In any event, how the erroneously excluded evidence would have impacted the jury's verdict is for it to decide. Based on my review, I conclude that there is a "reasonable possibility" that the erroneously excluded evidence could have resulted in a different verdict for Taylor. Therefore, I would have granted him a new trial.

For the aforementioned reasons, I respectfully dissent.

ELDRIDGE, J. has authorized me to state that he joins in this dissent.